847 So.2d 119 (2003)
Annette TOSTON, as Curatrix of Syvella Toston and Tutrix of Tyra Toston, Plaintiff-Appellee,
v.
James D. PARDON, Nelson R. Carr, Progressive Security Insurance Company, Illinois National Insurance Company, State of Louisiana, through Department of Transportation and Development, Defendants-Appellant.
No. 36,880-CA.
Court of Appeal of Louisiana, Second Circuit.
May 14, 2003.
*122 The Boles Law Firm, by Michael L. DuBos, Deutsch, Kerrigan & Stiles by Robert E. Kerrigan, Jr. Joseph L. McReynolds for Appellant, State of Louisiana, DOTD.
Philip T. Deal, Lewis O. Unglesby, for Plaintiff-Appellee.
Before BROWN, GASKINS, CARAWAY, MOORE and KOSTELKA (Pro Tempore), JJ.
CARAWAY, J.
This intersectional auto collision presents issues concerning the state's duty to maintain the intersection free of sight obstructions and the duty of the driver to stop in response to the posted stop sign. The driver made a stop immediately before the tragic nighttime accident. However, the driver's blood alcohol level was approximately three times the legal limit. The jury, nevertheless, determined that the driver was not at fault due to the sight obstruction within the immediate approach to the intersection. The state appeals. We reverse, finding that the sight obstruction was not a cause-in-fact of the accident.

Facts
The accident occurred at the "T" intersection of Lanes Ferry Road at State Hwy. 2 near the Bayou Macon Bridge in East Carroll Parish. The State of Louisiana, through the Department of Transportation and Development ("DOTD"), is the owner of east-west Hwy. 2 and is responsible for the signing of the intersection, which requires the Lanes Ferry Road traffic to stop. The dimensions for the accident scene reveal that the Bayou Macon Bridge is located approximately 160 feet to the west of the intersection. The bridge is 207 feet long. The south railing of the bridge rises to a height of 36 inches above the deck of the bridge. The Lanes Ferry Road rises up at a slope as it extends onto the right of way for Hwy. 2 to the intersection.[1] The stop sign on Lanes Ferry Road was placed down the slope approximately 27 feet from the fog line of the highway.
At 8:40 p.m. on April 9, 1997, James Pardon ("Pardon"), the driver of a Ford 350 one ton dually pick-up truck, was approaching the intersection traveling north on Lanes Ferry Road. He testified that he observed the stop sign and stopped. Pardon then proceeded to make a left turn onto Hwy. 2 and collided with a 1987 Mercury Cougar being driven by Nelson Carr ("Carr"). The guest passenger in Carr's vehicle, Syvella Toston ("Syvella"), was severely and catastrophically injured.
Carr's vehicle was traveling east on Hwy. 2 and had just crossed the Bayou Macon Bridge. Carr was not asked at trial how fast he was going, but the evidence indicates that he was not exceeding the 55 mph speed limit. Carr testified that he saw Pardon's truck stop at the intersection, then "it came on out." The left front corner of Pardon's truck collided with the right front quarter panel on the passenger side of Carr's vehicle.
Pardon was traveling north on Lanes Ferry Road, which parallels the east side of Bayou Macon. He was on his way home *123 from Sweet Pea's Bar. He spent the afternoon and evening there, playing video poker, drinking beer and at one point, eating some pizza. Pardon knew the Lanes Ferry Road vicinity well because of a nearby garbage dump, and he hunted in the area often.
Although he allegedly sustained some minor injuries as a result of the accident, Pardon did not lose consciousness. Officer Harwell, the state trooper investigating the accident, testified that he smelled a strong odor of alcohol about Pardon. He was taken first to the hospital in Lake Providence and then to the North Monroe Hospital, where a blood sample obtained at 11:55 p.m. revealed a blood alcohol level ("BAL") of 0.15g% alcohol. At trial, DOTD's expert toxicologist testified that another blood sample drawn earlier (at 10:10 p.m.) was 0.227g% alcohol. Using the two BAL figures, the toxicologist extrapolated the range of Pardon's BAL at the time of the accident to have been between 0.215g% and 0.293g% alcohol, which he characterized as "grossly intoxicated." The deputy sheriff's report indicated that Pardon was ticketed for failure to yield, DWI, and negligent injuring. Pardon subsequently pled guilty to DWI Second Offense and negligent injuring. Officer Harwell testified at trial that in his opinion, the cause of the accident was "the truck's failure to yield."
After the accident, Pardon consistently maintained that in spite of his intoxication, he remembered stopping at the intersection and looking both ways on Hwy. 2 before attempting the left hand turn. Pardon actually described stopping twice in his testimony. The first time was back from the intersection at the stop sign. He then indicated that he eased forward and stopped a second time. To show where he last stopped, during a pre-trial deposition, Pardon marked a red "X" on a photograph (Exh. DOTD-58, see appendix) to show the location of his truck's front bumper about three feet from the fog line of Hwy. 2. He identified the photo at trial and again indicated that location as an approximation of his final stopping point.
Pardon testified at trial that the only headlights he saw as he made his stop at the intersection were on the far west side of the bridge. On that opposite side of the bayou, there is another parish road that traverses Hwy. 2 north and south and apparently a store or other place of business. Pardon testified that he thought the car headlights turned off at the other parish road or the store. As to what he remembered seeing during the actual moments before the collision, Pardon admitted that he had thought "at one time that [Carr] did not have his lights on." Describing his final entry into the intersection, he answered as follows:
Q Mr. Pardon, as you looked out, as you started easing out as you alleged, where were you looking?
A I told you. I looked back toward East Carroll. And, then I looked back toward West Carroll.
Q But as you are easing out, as you are actually driving into the travel lane, easing out as you alleged
A I was looking toward West Carroll.
Q You were looking toward West Carroll Parish, down to your left?
A Yeah.
Q And you never saw
A Never saw
Q Nelson Carr's headlights?
A Never saw them.
Q Never saw his car until the impact, is that right?
Anever saw him, no.
Plaintiff's highway safety design expert, Dr. John Glennon, testified that the proximity *124 of the bridge to Lanes Ferry Road, the opaqueness of the bridge railing, the overall geographical terrain, and relatively low elevation of Lanes Ferry Road, all coalesced to effectively "hide" an eastbound car proceeding down Hwy. 2 from the view of a driver proceeding on Lanes Ferry Road. He stated that the sight problem, primarily caused by the bridge railing, exists when the driver's point of vision is from 15 to 30 feet away from the intersection. Dr. Glennon discussed the safety standards for the design and regulation of the highway intersection established by the American Association of State Highway and Transportation Officials ("AASHTO"). He stated that the AASHTO standard for the driver's observation point while stopping at an intersection is 20 feet from the edge of the pavement of the intersecting roadway (hereinafter the "AASHTO Location"). That standard takes into account the fact that a motorist may not always stop at the nearest location to the intersection where his field of vision would be best. From that point on Lanes Ferry Road, he determined the intersectional sight distance for an object approaching the intersection at the height of the headlights of the Carr vehicle. The average driver sitting at an eye level of 3½ feet above the ground at the AASHTO Location could only see easterly a distance of 320 feet to a point on the west end of the bridge. Beyond that point, the bridge railing would block the driver's vision of the headlights. According to Dr. Glennon, the amount of sight distance needed under AASHTO for the intersection was 550 feet.
In the DOTD's cross-examination of Dr. Glennon and the plaintiff's other expert, Dr. Morris Bronstadt,[2] an issue was raised regarding the utilization of two AASHTO factors. First, while AASHTO utilized a standard driver eye height of 3 feet 6 inches, Pardon's eye height in his large truck was 5 feet 3½ inches. Second, AASHTO allows for a 51-inch object height for the oncoming vehicle and makes no distinction for determining the sight distance in daylight or darkness. This object height roughly corresponds with the top of the Cougar in this case, which is 53 inches high. Nevertheless, Dr. Glennon's 320-foot sight distance calculation was based upon a 3½-foot driver eye height and an object height of only 26 inches, which corresponded to the headlight height of the Cougar. At the AASHTO Location twenty feet from the fog line, Dr. Bronstadt's distance calculation for seeing the top of the Cougar was 530 feet from the 5-foot 3½-inch vantage point of Pardon's truck. He also admitted on cross examination that one section of the AASHTO standards handbook contains a statement indicating that the beams of a headlight can be seen farther at night than the top of the car can be seen during daylight.
DOTD's expert in accident reconstruction, Dr. Mike James, testified that based on his SMACK reconstruction,[3] Carr's vehicle was going 45-55 mph and Pardon's truck was going 18-22 mph at the time of impact. He testified that the vehicles were turned at an angle when they collided, and that the damage in the side of the Cougar was caused by the forward momentum of Pardon's pick-up truck. Pardon's *125 truck "rode up on" Carr's vehicle, crushing the "A pillar," which attaches the roof to the hood of the car, eighteen inches. A cap or lug nut from the truck's front tire was imbedded in the door of the Cougar. The truck's right front tire flattened on impact, leaving gouge marks visible near the centerline of the road. According to Dr. James, the impact occurred very close to the centerline of Hwy. 2. The force of Pardon's truck, which weighed 5,700 pounds empty and was also carrying an arc welding machine in the cargo bed that day, moved the Cougar sideways, bringing it to rest in a ditch. Pardon's truck spun around and ultimately came to rest farther down Lanes Ferry Road. Dr. James estimated the truck's post-impact speed at 5 to 10 miles per hour as it rolled back down Lanes Ferry Road.
Dr. Glennon testified that in his opinion, the physical evidence of the collision indicated that Pardon's truck was traveling at approximately 5 to 8 mph as he pulled out onto Hwy. 2. Dr. Glennon disputed the SMACK's results and testified that based on his calculations, if the truck was traveling at 22 mph, the car and the truck would have ended up in a different position, farther to the north. He characterized the collision between the pick-up truck and the Cougar as "ha[ving] all of the characteristics of a vehicle that has pulled out from a side road at a very slow speed ..." and that the slow speed of Pardon's truck tended to suggest that Pardon had stopped before entering the intersection. On the other hand, when Dr. James employed Dr. Glennon's estimate of 6.7 mph for Pardon's truck into the SMACK program, the resulting collision produced a maximum crush of six inches on the Cougar door, compared to eighteen inches of actual crush produced by the accident.
Dr. James also conducted two tests which were presented on a video tape showing vehicles moving along Hwy. 2 at night. The camera was located in two positions on Lanes Ferry Road, one at the stop sign where the sight distance would be approximately 27 feet from the fog line of Hwy. 2 (hereinafter the "Stop Sign Location"). The other sight location was 10½ feet from the fog line of Hwy. 2 which would have been the nearest stopping point to the intersection (hereinafter the "Nearest Location"). At that point, which would place the front of the truck three feet from the fog line, the video showed that the oncoming vehicle lights would have been constantly within view well beyond the western end of the bridge and visible for over twelve seconds.
Plaintiff presented evidence that DOTD had notice of problems with the Bayou Macon Bridge as early as 1972, when the East Carroll Parish Police Jury requested "a study of the inability to view eastbound traffic" on the bridge. The DOTD also conducted a second traffic study in December, 1990, and concluded that because of the low traffic volume at the intersection, the installation of a traffic signal or flashing beacon (like the one at the intersection on the opposite side of the bayou) was not justified. A DOTD letter describing the intersection study noted that only one accident occurred at the intersection in question during the previous three years, and that this accident involved a right-angle collision.
Former state representative, Jess Smith, and James McDaniel, formerly the parish highway superintendent, testified at trial concerning the above problems with the intersection. Additionally, the pastor and a deacon from the nearby Lanes Ferry Baptist Church testified about their concern over the possibility of accidents caused by the alleged "blind spot" on the bridge. Finally, Ronald Pippen and Greg Johnson, both local farmers who lived *126 nearby, testified about a "near miss" accident that they had one night as they pulled onto the highway from the parish road.
Syvella's mother, Annette Toston, in both her capacity as curatrix of her daughter, and as tutrix of her granddaughter, sued the drivers of both vehicles and their respective insurers, East Carroll Parish Police Jury and the DOTD. Each driver had the minimal $10,000 liability coverage. Carr and his insurer, Illinois National Insurance Company, were dismissed early from the proceedings. Pardon, his insurer, and the police jury were dismissed from the proceedings before trial.
After a five-day jury trial and two hours of deliberations, the jury returned a split verdict allocating 100% of the fault for the accident to DOTD. Pardon and the parish were found to be without fault by the jury.
The jury awarded damages, including loss of consortium to Syvella's family, totaling $11,097,935.31. Thereafter, because of adjustments by the trial court to the past medical damage award and to the general damage awards pursuant to the statutory cap set forth in La. R.S. 13:5106, the total judgment was reduced to $7,127,964.99.
DOTD suspensively appeals the judgment.

Discussion

I.
DOTD asserts that the jury erred in its finding that Pardon was not negligent. Negligence is determined in Louisiana under the duty-risk analysis. The determination of liability in a negligence case usually requires proof of five separate elements: (1) proof that the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) proof that the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) proof that the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) proof that the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) proof of actual damages (the damages element). Boykin v. Louisiana Transit Co., Inc., 96-1932 (La.3/4/98), 707 So.2d 1225, 1230, rehearing denied, 4/24/98.
This case concerns the parties' opposing assertions of negligence. They insist, respectively, that either DOTD or Pardon was the sole cause of the accident. Plaintiff argues that any negligence on the part of Pardon must be relieved by the substandard conduct of DOTD in maintaining a blind intersection for Lanes Ferry Road motorists. This argument suggests that DOTD's actions were the overriding cause-in-fact of this accident. To address this argument, we will first explore the duty, breach, and scope of liability issues comprising the negligence of which Pardon was allegedly relieved.[4]
The duties of Pardon are legislatively detailed in traffic regulations applicable to drivers of motor vehicles. La. R.S. 32:123(B) defines the duty of the motorist approaching an intersection regulated by a stop sign as follows:

*127 Except when directed to proceed by a police officer or traffic-control signal, every driver and operator of a vehicle approaching a stop intersection indicated by a stop sign shall stop ... at the point nearest the intersecting roadway where the driver has a view of approaching traffic on the intersecting roadway before entering the intersection. After having stopped, the driver shall yield the right of way to all vehicles which have entered the intersection from another highway ...
(Emphasis supplied.) From this statute, the driver's duty is two-fold. He must first maneuver his vehicle to the point nearest the intersection and stop at that point. Second, he must determine by his view at that stopping point that he may safely enter the intersection.
Addressing a case of multiple tortfeasors, one of which caused the obscurement of a stop sign, the court in Westchester Fire Ins. Co. v. Dardar, 158 So.2d 239, 242 (La.App. 4th Cir.1963), defined the driver's duty as follows:
Where an automobile driver approaches a blind intersection, even where the two streets are of equal dignity, he must exercise a greater degree of care than is ordinarily required, must enter the intersection at a reasonable speed and must make certain before entering that there is no other vehicle about to enter.
Finally, various criminal and civil statutes proscribe the act of driving a motor vehicle while under the influence of alcohol. La. R.S. 14, Sections 32.1, 39.1, 39.2, and 98; La. C.C. art. 2315.4. These statutes demonstrate the high duty placed upon Pardon in this case.
The breach element in this case is clear. Pardon drove his truck into the intersection in a manner indicating that he did not yield the right of way to the Carr vehicle which constituted an immediate hazard in the intersection. Additionally, as admitted by plaintiff, Pardon was driving while intoxicated with his BAL approximately three times the legal limit. This indicates that Pardon breached the duty not to drive after consumption of alcohol.
Regarding the scope of the duty analysis, Louisiana has no negligence per se doctrine. Galloway v. State Through Dept. of Transp. and Development, 94-2747 (La.5/22/95), 654 So.2d 1345; Boyer v. Johnson, 360 So.2d 1164 (La. 1978); Weber v. Phoenix Assur. Co. of New York, 273 So.2d 30 (La.1973). Therefore, a statutory violation must be determined as a legal cause of the accident. Id. at 33. A violation of a criminal statute does not automatically create liability in a particular civil case, because the statute may have been designed to protect someone other than the plaintiff, or to protect the plaintiff from some evil other than the injury for which recovery is sought. Boyer, supra at 1168-1169. "Yet, where a criminal statute imposes a duty designed to protect a particular person from a particular type of injury, one who has so injured such a person by a breach of the prescribed duty cannot evade civil liability by persuading the court to disregard the clear legislative prohibition as if it were a mere discretionary `guideline.'" Id. at 1169.
The scope of the duty inquiry is ultimately a question of policy as to whether the particular risk falls within the scope of the duty. Faucheaux v. Terrebonne Consol. Government, 615 So.2d 289, 293 (La.1993). The scope of protection inquiry asks whether the enunciated rule extends to or is intended to protect this plaintiff from this type of harm arising in this manner. Id. at 294.
*128 The statutory duties imposed upon Pardon were intended to avoid the tragic intersectional collision that occurred. More specifically, the risk presented to the passengers of the Carr vehicle which could not be seen constantly during Pardon's immediate approach to the intersection was within the ambit of the duty imposed upon Pardon to stop at the "point nearest" to Hwy. 2. Likewise, an intersectional collision caused by the inability to react to the approaching vehicle, to precisely stop the vehicle in relation to the intersection, and to survey and negotiate all of the dangerous circumstances present at a highway intersection is the risk of harm which is within the scope of protection of our rules prohibiting drunk driving.
From these initial inquiries under the duty-risk analysis, the facts of this case indicate that Pardon was at fault. Nevertheless, the plaintiff does not attempt to defend the jury's verdict regarding Pardon on the above factors. The plaintiff asserts that because of Pardon's inability to see oncoming traffic, attributable to the sight obstruction created by the bridge rail, his actions were not the cause-in-fact of the accident.
The two DOTD video tapes demonstrated the driver's field of vision for the movement of a car proceeding easterly along Hwy. 2 at night. Dr. James conducted the first test at two camera locationsthe Stop Sign Location approximately 27 feet from the fog line of Hwy. 2, and the Nearest Location approximately 10½ feet from the fog line. The moving vehicles utilized in both videos had headlights 26 to 27 inches above the ground which compared to the height of the headlights for the Cougar. The cars were traveling at 50 mph. The camera was mounted at a height of 62 inches which was approximately the eye level of Pardon in the large truck he was driving.
Although the quality of the first video presented the two headlights of the oncoming car in a blurred manner, the video adequately depicts the lights as they first come into view west of the bridge beyond the other intersection on the west side of the bayou. This other intersection was regulated by a blinking yellow and red light for Hwy. 2 and the parish road, respectively. The blinking light provided another vantage point for the nighttime video showing the car appearing first to the west of the blinking light and then passing the light and entering the bridge. Because of the quality of the video, Dr. James later made a second video which filmed the car only from the Nearest Location. In both videos, a party in the moving car is heard speaking to Dr. James over a two-way radio counting down the number of seconds as the car moved from the west side of the bridge to the intersection where the accident occurred.
The two locations of the DOTD's videos depicted significantly contrasting views of the oncoming car. At the Stop Sign Location, the car's lights disappeared from view before the time the car first entered the bridge. Other evidence showed that on the west side of the bridge, Hwy. 2 sloped down a hill so that the roadway's elevation dipped below that of the surface of the bridge. The lights began to reemerge approximately three to four seconds later as the car neared the center of the bridge. This blind spot for observing the car's path along Hwy. 2 is due in part to the fact that the stop sign observation point is down the slope of Lanes Ferry Road and the side railing of the bridge is seen in its entirety. Looking down the railing at an angle acts to block the view of the car along with the dip in the highway on the west side of the bridge. Dr. James admitted in his testimony that "back at the stop sign the visibility is not as good."
*129 At the Nearest Location, both videos reveal that the lights of the oncoming vehicle are never lost from view. The car appears from a curve beyond the blinking lights of the other intersection, passes that intersection, and proceeds across the bridge while a count of twelve seconds was given on the audio. The car was constantly in view for over twelve seconds in both videos taken from the Nearest Location. Discussing a driver's stopping point, Dr. Glennon conceded in his testimony, "[i]f you drive close enough to the intersection, you can see down Hwy. 2." This was also borne out by Dr. Bronstadt's calculation which confirmed that the Cougar would remain entirely in view with a driver eye height of 5 feet 3½ inches at ten feet from the fog line.
Cause-in-fact is generally a "but for" inquiry; if the plaintiff probably would not have sustained the injuries but for the defendant's substandard conduct, such conduct is a cause-in-fact. Faucheaux, supra at 292. To the extent that the defendant's actions had something to do with the injury the plaintiff sustained, the test of a factual, causal relationship is met. Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620, 622 (1972).
The cause-in-fact issue is usually a jury question unless reasonable minds could not differ. Cay v. State, Dept. of Transp. and Development, 631 So.2d 393 (La.1994). A court of appeal may not set aside a trial court's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Theriot v. Lasseigne, 93-2661 (La.7/5/94), 640 So.2d 1305; Stobart v. State Through Dept. of Transp. and Development, 617 So.2d 880 (La.1993).
Plaintiff's brief asserts that "from the stop sign, along Lanes Ferry, the intersecting car (Pardon's) can't see a car on Hwy. 2." (Emphasis supplied.) This argument that Pardon was not a cause-in-fact is therefore based on the assertion that Pardon, despite his testimony, did not make his final stop at the Nearest Location, but instead stopped ten to fifteen feet further back from the intersection where his vision was impaired. Under the manifest error standard, we agree that the trier-of-fact could conclude that Pardon may have been mistaken concerning his final stopping point. Nevertheless, there are implications from that factual conclusion and other undisputed facts which bear on the cause-in-fact inquiry.
First, at the 20-foot AASHTO Location, the line of sight which Pardon had available extended back to the west, almost to the end of the bridge, 320 feet and more.[5] That indicates that the sight problem existing at the intersection was only a partial factor in Pardon's ability to recognize the movement of traffic and in his negotiation of the intersection after stopping at that point. He was not totally blinded, and as his truck would have begun its movement forward to the intersection from that point, he would be able to see the Carr vehicle. It is unreasonable to view the evidence as establishing that Pardon had no opportunity to see the approaching vehicle as he stopped or moved slowly[6] within the final 20 feet before reaching the intersection. Second, Pardon was familiar with the intersection. *130 Therefore, as his testimony indicates, he knew that he could not reach a safe point for viewing the traffic on Hwy. 2 until he stopped at the nearest point to the intersection. Third, a stopping point so that Pardon's vision was at the 20-foot mark or further back near the stop sign establishes the more significant fact that he did not stop at the point nearest the intersection where his vision upon stopping would be completely unimpaired. Fourth, Pardon's vision, his attentiveness, and his response time, more probable than not, were impaired by the effect of his intoxication.
From the evidence revealing these four facts, it would be manifestly erroneous for the trier-of-fact to conclude that Pardon was not a cause-in-fact of the accident. The accident probably would not have occurred if Pardon had stopped at the point nearest the intersection and not been intoxicated. The materiality of these facts springs from the significant statutory duties regarding the observance of stop signs and driving without the influence of alcohol. Accordingly, we find that the jury's verdict was clearly wrong and manifestly erroneous. The clear field of vision available to Pardon at the point nearest the intersection, his familiarity with the intersection, and the strong inference of Pardon's impairment from his intoxication are facts for which the jury's verdict does not account. Pardon was at fault, and his actions and inaction were a cause-in-fact of the accident.

II.
We reviewed Pardon's negligence first due to the significance of the specific statutory duties imposed on him regarding the regulation of safety at the intersection. The DOTD argues that because of those duties and Pardon's reckless disregard for safety caused by his intoxication, the DOTD may not be found negligent in this case. Nevertheless, despite the substandard conduct of one tortfeasor, another party's alleged fault must be measured by consideration of the particular duty owed by that party. We must therefore apply the duty-risk analysis to determine whether the jury's verdict of negligence on the part of the DOTD may be affirmed.
The DOTD's duty is a question of law. Faucheaux, supra. The DOTD's duties arise from its ownership of Hwy. 2 and its duty for signing the intersection. La. R.S. 48:21(A); Forest v. State, Dept. of Trans. & Dev., 493 So.2d 563 (La.1986). In similar settings, the Louisiana Supreme Court has stated that the DOTD's duty is to design and provide a controlled intersection that did not present an unreasonable risk of harm to motorists. Boykin, supra. at 1231; Lasyone v. Kansas City Southern R.R., 00-2628 (La.4/3/01), 786 So.2d 682.
The specific breach of DOTD's duty asserted in this case is that the slope of the parish road as it lies within DOTD's right-of-way and the bridge railing of Hwy. 2 combined to create a blind spot which is an unreasonable risk of harm. The driver on the parish road in his immediate approach to the intersection is blinded in his view of oncoming traffic on Hwy. 2.
The law concerning the cause-in-fact determination is stated above. Additionally, we have reviewed the jurisprudence where sight obstruction is asserted as contributing to the cause of an intersectional traffic accident. In Harrison v. State, Dept. of Highways, 375 So.2d 169 (La.App. 2d Cir.1979), this court affirmed a trial court ruling that a five-foot high bridge railing extending to a point very near an intersection was a contributing cause of the accident because drivers at the nearest stopping point could not see *131 approaching vehicles. Nevertheless, in a recent case decided on summary judgment in favor of the defendant, the intersectional sight obstruction was found not to be the cause-in-fact of the accident. Row v. Pierremont Plaza, L.L.C., 35,796 (La.App.2d Cir.4/3/02), 814 So.2d 124, writ denied, XXXX-XXXX (La.8/30/02), 823 So.2d 952. In Row, this court determined that although an obstruction posed a sight hazard at the intersection, the driver's negligent turn into the superior lane of traffic occurred after she had stopped and moved forward beyond the hazard. The obstruction thus became immaterial as a causal factor of the accident.
The cause-in-fact inquiry asks whether this accident would probably not have occurred but for the slope of the parish road and the bridge railing which combined to cause the sight obstruction. From the testimony of the two drivers, there is no dispute that Pardon was appropriately warned and stopped his truck in response to the DOTD's signing of the intersection. If he stopped so that the front of the vehicle was within eight feet or less of the fog line for Hwy. 2, the evidence indicates that he could have seen the Cougar for a sufficiently long distance to properly negotiate a turn into the intersection. Nevertheless, the trier-of-fact could also reasonably conclude, as indicated above, that Pardon stopped his vehicle further back from the intersection where the travel route of the Carr vehicle could not be constantly seen.
When we accept the fact that Pardon's vehicle stopped short of the safest and nearest point to the intersection, the evidence presents a range of possible viewing points where his vision was impaired. Nevertheless, using the 20-foot AASHTO Location upon which Dr. Glennon expressed his opinion, the driver could see over 320 feet to his left down Hwy. 2 to approximately the end of the bridge. At the AASHTO Location, the front of the truck would be 12½ feet from the fog line and approximately 22 feet from the point of the collision. The plaintiff's 320-foot calculation of the intersectional sight distance did not employ Pardon's 5-foot 3½ inch observation height and only considered the view of the 26-inch headlights of the Carr vehicle. Therefore, the nighttime glow of the headlights would be observable from the higher driver position in Pardon's truck as the Cougar entered the bridge (367 feet) or before. Despite the blind spot associated with the AASHTO Location, as the Cougar approached at up to 55 mph or 80 feet per second, it would have been in Pardon's view for approximately five seconds before impact.
The next consideration concerns the movement of Pardon's truck and the time which elapsed for the final 22 feet after the truck left the stopping point and accelerated across the fog line into Carr's lane to the collision point. The plaintiff's expert determined the truck's speed at the moment of impact at 5 to 8 mph. Therefore, using an average speed of 3 mph (4.4 feet per second) as the truck slowly accelerated through the final 22 or more feet to almost the center of Hwy. 2, it would have taken Pardon approximately five seconds to reach the point of collision. The Cougar, therefore, would have been entirely within Pardon's field of vision for the final four to five seconds during his movement toward the intersection. Yet, Pardon testified that he saw nothing and believed the Cougar's headlights were off at the time of the accident. He never saw the lights of the Carr vehicle even though he remained conscious throughout the accident.
Pardon's insistence that he saw no headlights immediately before the accident contradicts what would be reasonably expected to be seen by a driver slowly starting *132 forward after stopping short of the intersection. Such driver would see that he could not make the turn to his immediate left after stopping at the AASHTO Location. He has to drive forward and be looking to his left to identify the point to begin his left turn maneuver onto Hwy. 2. During such maneuver, the driver would at least see the approaching vehicle, whether or not he could successfully respond with evasive action. Pardon's commencement of the slow forward motion took an amount of time coinciding with the four to five second time period in which the Carr vehicle became visible. Yet, Pardon never saw the vehicle.
This undisputed fact of Pardon's failure to see the vehicle leads us to conclude that his impairment from alcohol was the sole cause of the accident. The AASHTO Location urged by the plaintiff already takes into account that Pardon, out of disorientation or driver error, stopped at a location in violation of Louisiana's rule for stopping at the nearest point to the intersection. Nevertheless, even allowing for this driver error at the AASHTO Location, Pardon was in a position to see the other vehicle as he began moving forward and should have at least reported an attempt at evasive action. The fact that he missed the nearest stopping point and saw nothing thereafter as he began moving to the intersection must be attributable to his intoxication. With such impairment the accident probably would have occurred irrespective of the sight problem caused by the slope of the parish road and the bridge railing.

Conclusion
Accordingly, we reverse the ruling of the trial court from our determination that the jury verdict was manifestly erroneous and clearly wrong in not finding the driver's intoxication and his failure to stop at the point nearest the intersection as the sole cause-in-fact of the accident. Costs are assessed to appellee.
REVERSED.

APPENDIX

*133 
NOTES
[1] See attached copies of photographs (Toston Exh. #31 and DOTD Exh. # 58) depicting bridge and intersection.
[2] Dr. Bronstadt actually made the measurements for the intersectional sight distance for the plaintiff.
[3] SMACK is a computer program developed by the federal government for use by engineers, physicists and accident reconstructors which replicates the mechanics of an accident based on inputting certain variables such as vehicle size and weight, physical damage, and speed; in this case, the program generated a model consistent with the damage pattern on both vehicles and the physical evidence found at the accident scene.
[4] The cause-in-fact inquiry is usually the first inquiry in the duty-risk analysis. For judicial economy, if the defendant's action is not a cause-in-fact, there is no need to explore the more involved inquires of duty and scope of duty. However, in the case of concurrent or successive causes of harm by multiple tortfeasors, the traditional but-for test of cause-in-fact becomes more difficult because each actor's substantial conduct which led to the harm can be argued as exonerating the conduct of the other. We will work through such finger pointing in this case by initially examining the duty, breach and scope of duty elements.
[5] Dr. Glennon admitted that Pardon's additional height advantage in his large truck, 21 inches above the 3½-foot level utilized by AASHTO, caused his line of sight to extend further than the 320-foot calculation he determined using the 3½-foot standard.
[6] The two conflicting views of the speed of Pardon's vehicle at the time of impact are discussed above. With the deference which is given under the manifest error standard, we will accept the plaintiff's expert's view that Pardon's truck moved slowly into the intersection.