870 So.2d 390 (2004)
J. Ray THOMAS, Plaintiff-Appellee
v.
SISTERS OF CHARITY OF THE INCARNATE WORD d/b/a Schumpert Medical Center and XYZ Insurance Company, Defendant-Appellant.
No. 38,170-CA.
Court of Appeal of Louisiana, Second Circuit.
March 19, 2004.
Rehearing Denied May 6, 2004.
*392 Mayer, Smith & Roberts, L.L.P., by Mark A. Goodman, Kelly J. Workman, for Appellant.
Modica, Dowden & Cascio, by Guy A. Modica, Sr., Baton Rouge, for Appellee.
*393 Before BROWN, GASKINS & CARAWAY, JJ.
GASKINS, J.
In this wrongful death action, the decedent, a hospital patient, fell three stories to his death after he became locked out on the hospital roof and sat on a ledge in an apparent attempt to attract assistance. Following a bench trial, the trial court found that the fire exit configuration which allowed the patient access to the roof created an unreasonable risk of harm that was the cause-in-fact of his death. The hospital was assigned 65% of the fault for the accident, and the patient, who was found to be alert and oriented, was assessed 35%. The hospital appealed the liability determination, while the plaintiff answered the appeal to request additional damages and a reduction in the fault allocation. Finding that the risk encountered by the patient on the edge of the building was within the scope of duty of the hospital, we affirm.

FACTS
After the death of his 82-year-old father, Isaac Hardman, Jr. ("Hardman"), J. Ray Thomas ("Thomas") instituted this wrongful death and survival action against Sisters of Charity of the Incarnate Word d/b/a Schumpert Medical Center ("Schumpert").[1] On the morning of the accident, March 8, 1992, Hardman was a pneumonia patient at Schumpert. He had been in the hospital for over a week and was expecting to go home in the near future. Vickye Backus, the attending nurse, described Hardman as being short of breath and requiring the assistance of oxygen early that morning; however, he was able to walk without assistance and was alert and oriented. In her initial visit with her patient at 7:15 a.m., Nurse Backus assisted him from the bathroom to his bed. He was able to walk on his own and maintain his own weight. At that time, Hardman requested that a nursing assistant clean his room because he was going to have visitors that day.
Nurse Backus recalled that she visited with Hardman at least four times that morning. She described him as alert and oriented, exhibiting no expressions of depression or suicide. The medical records show that Hardman had previously expressed a desire to go home and that he was concerned that he might have leukemia; however, his tests for that disease had come back negative on March 2, 1992.[2] At 8:00 a.m., Hardman received a breathing treatment. Nurse Backus administered cough medicine to Hardman at 9:00 a.m., and intravenous penicillin at 10:00 a.m. which she disconnected at 10:30 a.m. At 10:55 a.m., a radiology employee located Nurse Backus at the nurses' station and informed her that Hardman was not in his room and could not be located for transport to a scheduled procedure.
In the meantime, Hardman was spotted on the roof of the hospital. A support technician, Leroy Smallwood, Jr., and a hospital physician, Dr. Alan Borne, gained entry onto the roof in an effort to assist him. As the two sought to reach Hardman, who was seated on a ledge of the hospital roof, the patient raised his hand and thereafter fell from the roof ledge onto a lower loading dock roof. Subsequent attempts to save Hardman's life were unsuccessful *394 and he died from the injuries sustained in the fall.
In the effort to reconstruct the course taken by Hardman from his room and to show the layout of the building and the fire exit onto the roof, the parties introduced numerous exhibits at trial including photographs, the hospital policy manual and applicable building codes. The stipulation of facts, evidence and testimony generally established that on the day of the accident, Hardman's south-wing, fifth-floor hospital room was near the end of a hallway, situated two doors from a fire exit door. The undisputed photographs admitted into evidence show that the emergency fire exit door was marked only by a traditional exit sign located in the hallway above the door. Immediately past the exit, at the very end of the hall, were two windows which looked out upon the hospital roof. As one looked down the hallway from the nurse's station toward the windows, both Hardman's room 542 and the fire exit door would have been on the right.
Sometime between 10:30 and 10:55 a.m. on the morning in question, Hardman dressed himself and exited his room turning right. He then apparently opened the fire exit door which swings inward into the hallway. On the back of this door is a sign indicating the fifth floor level. Photographs show that a ten-step stairway leading up to the next floor is located directly in front of the door. To the left is a three-step stairway and landing which Hardman utilized to get to a door leading to a catwalk on the Schumpert roof. The roof is flat and is on top of the hospital's fourth floor which extends well beyond the fifth floor wing of the hospital where Hardman's room was located. The parties do not dispute that no other signs or markings directed or explained the purpose of the stairs or doors or gave directions inside of the stairwell or on the catwalk on the roof.
The record shows that renovations to the hospital in 1989 required a change in the stairwell, which originally allowed access from the fifth to the fourth floor. At that time, the exit down to the fourth floor was eliminated and the three-stair landing and catwalk were added as part of the emergency exit onto the roof.
After Hardman turned left and climbed the three stairs, he encountered an unmarked door which contained a push bar. Hardman then opened the door to the outside and exited onto the catwalk on top of the roof. The door shut behind him and locked. The fire escape catwalk on which he would have found himself was encased by 42 inch hand railings on both sides. It traversed approximately 130 feet across the roof to a door that opened into another stairwell that led down five flights to an exit from the building. For purposes of fire protection, that door at the end of the catwalk could be opened from the outside on the roof, but would lock once an individual shut it and was inside the fire escape stairwell.
Instead of walking the length of the catwalk, Hardman climbed over the left rail onto the roof of Schumpert in a direction toward the fifth floor hall windows that looked out onto the roof. The plaintiff's expert surmised that Hardman chose this path because the other direction, 130 feet across the roof, appeared to offer no option for obtaining assistance.
It is unknown whether Hardman climbed off the catwalk onto the roof itself to seek the attention at the windows of anyone in the hallway on the fifth floor. Nevertheless, he apparently traveled across the roof and descended approximately three-and-one-half feet to a lower sub-roof level. Then he descended again another two-and-one-half feet to a second *395 sub-roof which brought him to an edge of the building. At the edge, there appears to be a marble ledge extending slightly above the level of the roof. There, Hardman would have stooped down and sat with his feet dangling over the side of the roof. At that location, Hardman was three stories above the roof of the loading dock area of the hospital upon which he ultimately fell.
Pamela Rampmaier, a respiratory therapist, viewed the incident from a sixth-floor window. Rampmaier testified that she saw the fully clothed Hardman sitting on the ledge of the roof, "staring kind of downward." She was able to see his entire body and at some point she saw that he had been distracted because "he turned," "stuck his hand out, like stop" and fell. She was unable to see why he was turning. Rampmaier felt that Hardman intentionally fell off the roof although he did not push himself off the ledge.
Smallwood, the support technician who accompanied Dr. Borne to the roof, first saw Hardman from a room on the sixth floor; he was looking down and wearing street clothes. Smallwood was then asked to go with Dr. Borne to the roof. Like Hardman, Smallwood and Dr. Borne gained entry to the roof via the fire exit and catwalk. They also jumped the guardrails, and remained on that roof level as they sought to attract the patient's attention. Smallwood testified that he said hello in a soft voice and that when Hardman saw them, "he turned around," "looked at me and he smiled," and then "raised up his hand and he went over." Smallwood described the hand gesture as a wave and he didn't know whether the victim jumped or "just went off the roof."
Dr. Borne testified at trial and also read into evidence a letter he composed two days after the incident summarizing the event. In the letter, Dr. Borne stated that on the morning of the incident, he was seated at the sixth floor doctors' dictating area when he heard a ward clerk call security regarding an elderly man on the hospital roof. Dr. Borne went to a window and saw Hardman sitting on the roof ledge with his legs dangling, looking out into the distance, with his hands on the ledge. Dr. Borne wrote that the patient "appeared to be moving slightly forward" and appeared to be in danger of falling off the ledge at any minute. Dr. Borne asked Smallwood to go with him to the roof. The two approached Hardman from behind and the patient was approximately four or five feet below them. Dr. Borne further noted that as he and Smallwood approached the patient, they did not know what to do. Hardman continued to make small movements and it appeared that he would fall off at any moment. Smallwood attempted to get Hardman's attention. As he did so, the patient turned slightly to the left to look at Smallwood and fell off the ledge. In his letter, Dr. Borne explained that "he had reached the point of balance where he just spilled over the ledge." Dr. Borne also noted that Hardman attempted to grab the ledge as he fell.
The parties also presented expert testimony regarding the issue of the configuration of the fire exit on the fifth floor. Both experts evaluated the issues of whether the automatic locking door, lack of signs and overall exit configuration posed an unreasonable risk harm due to building code violations. Specifically, both experts offered testimony regarding the fire exit's compliance with the 1988 Standard Building Code, a parish code utilized by parish authorities, and the Life Safety Code, utilized by the State Fire Marshall's office.
The plaintiff's expert, Michael Frenzel, was accepted in the fields of accident investigation and re-enactment and hazard recognition, evaluation and control. Frenzel *396 concluded that while the codes permitted that the door lock after exit, such was not required. He opined that in this case, it was not necessary for the door to be locked because the roof is a controlled area. Frenzel also determined that the lack of signage violated both the Life Safety and 1988 Standard Building Codes. Frenzel stated that the Life Safety Code required that signs be located near the door leading to the catwalk instructing an individual where they were going. Frenzel testified that such lack of outside signage posed the risk of confusion or panic for an individual who got locked outside without instruction on where to go. Likewise, Frenzel opined that the Building Code of 1988 applied to the stairway renovation at issue and required that signs be placed at all exits, and should have indicated floor level and availability of roof access from the stairway. Moreover, the 1988 Standard Building Code required that signs direct an individual to the exit discharge or ultimate exit to the outside of the building. Finally, Frenzel testified that this lack of signage also violated the hospital policy and procedures manual which required that the roof should have been marked as a restricted area. Frenzel stated the various warning alternatives, such as a buzzer, alarm or light on the door would have been feasible alternatives for directing or assisting individuals trapped on the roof. Ultimately, Frenzel concluded that the exit configuration was unsafe for either ordinary or emergency use because of the confusion encountered by an individual locked out of the building without any direction or instruction on where to go.
The defendants utilized the expert testimony of Todd Gritch, an expert architect with a speciality in code compliance. Additionally, Gritch had been involved in the 1989 renovation project, specifically working with the State Fire Marshall and local code authorities to devise the exiting system. The parties stipulated that the fire exit configuration was approved by the Office of the State Fire Marshall. Gritch agreed with Frenzel that the applicable codes did not restrict the locking of the exit door in question. Contrary to Frenzel, however, Gritch was not of the opinion that the exit configuration violated either the applicable Life Safety or Building Codes. Gritch interpreted the Life Safety Code as requiring signage only at the exit access site or the hallway door leading to the stairwell. Regarding the Standard Building Code, Gritch disagreed with Frenzel that the 1988 Code applied to the renovation because that Code was not retroactive to construction existing before its enactment. In his opinion, the subject stair tower was not renovated by the new construction and therefore, the edition of the code existing at the time of the original construction would have applied. Even though the catwalk would have qualified as a renovation, signage was not required as it was not an exit access because the crosswalk was internal to the exit. Although Gritch agreed that alternate warning devices would have been feasible, he testified that such measures were not required by the code.
After a bench trial, the trial court ruled in favor of Thomas, finding the fire exit system unreasonably dangerous to sick or infirm patients due to multiple code and safety manual violations that included the lack of signs directing to a safe exit, the absence of a notification system and the unmarked automatic locking door, all of which were the cause-in-fact of Hardman's death. Additionally, the court rejected a claim by Schumpert that Hardman had committed suicide due to his distress over having leukemia, finding the evidence to be inconsistent with that conclusion. Instead, the court specifically found that Hardman fell off the roof ledge as he tried to get up *397 from his seat on the ledge. Finally, the court assigned Hardman 35% of the fault, rejecting the plaintiff's assertion that Hardman was in an infirm condition. The court observed:
It is noteworthy that Mr. Hardman had a normal neurological assessment indicative of the fact that he was alert as to person, time and place; he exhibited appropriate demeanor and behavior; and there is no indication that he was under the influence of any mind or mood altering medication that might otherwise be prescribed to hospital patients that are in pain or clinically depressed.
In damages, the court awarded $25,000 for Hardman's wrongful death, plus $7,500 for the survival action. However, these amounts were reduced based on Hardman's comparative fault.

DISCUSSION
From the evidence and the trial court's ruling, we view this action as a traditional negligence claim predicated on Schumpert's failure to warn and direct persons utilizing the fire exit onto the roof's catwalk. In Faucheaux v. Terrebonne Consol. Government, 615 So.2d 289 (La.1993), where the defendant was found negligent for a failure to warn of a perilous condition through adequate signage, the court implemented a duty-risk analysis. Under this analysis, the plaintiff must prove that the conduct in question was the cause-in-fact of the resulting harm, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant, and the risk of harm was within the scope of protection afforded by the duty breached. Faucheaux, supra; Lazard v. Foti, 2002-2888 (La.10/21/03), 859 So.2d 656; Posecai v. Wal-Mart Stores, Inc., XXXX-XXXX (La.11/30/99), 752 So.2d 762, 765. Under the duty-risk analysis, all four inquiries must be affirmatively answered for the plaintiff to recover. Posecai, supra.

Duty Inquiry
Whether a duty is owed is a question of law. The inquiry is whether the plaintiff has any law, statutory or jurisprudential, to support his claim. Lazard, supra. There is an almost universal duty on the part of the defendant in negligence cases to use reasonable care so as to avoid injury to another. Boykin v. Louisiana Transit Co., Inc., XXXX-XXXX (La.3/4/98), 707 So.2d 1225. It is only that conduct which creates an appreciable range of risk for causing harm that is prohibited. Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620, 622 (1972).
The principal duty in relation to this unusual exit required that Schumpert direct and advise persons regarding the use of the exit in the event of an emergency. Additionally, however, the door was located in a stairwell near patients' rooms which allowed for the possibility that a patient or other person might utilize the exit by mistake or simply to obtain a breath of fresh air from the confines of the hospital.[3] Because of the access to the exit which occurred in both emergency and non-emergency cases, we agree with plaintiff's contention that Schumpert had a duty of reasonable care for the direction of the public regarding the use of the disputed exit. Without the fulfillment of such duty, an appreciable range of risk for causing harm existed.

*398 Breach of Duty

Given Schumpert's duty regarding this exit, its breach of that duty was clear. The door to the roof contained no warning that it would lock Hardman out of the building if he exited. Neither on the door nor on the catwalk were there directions regarding where the 130 foot catwalk would lead. Whether Hardman exited the building voluntarily or out of momentary confusion, Schumpert breached its duty to warn him that he would be locked out and to direct him across the catwalk to the fire exit stairwell.

Cause-in-fact
Cause-in-fact is generally a "but for" inquiry; if the plaintiff probably would not have sustained the injuries but for the defendant's substandard conduct, such conduct is a cause-in-fact. Faucheaux, supra. To the extent that the defendant's actions had something to do with the injury the plaintiff sustained, the test of a factual, causal relationship is met. Hill, supra. The cause-in-fact issue is usually a jury question unless reasonable minds could not differ. Cay v. State, Dept. of Transp. and Development, 93-0887 (La.1/14/94), 631 So.2d 393. A court of appeal may not set aside a trial court's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Theriot v. Lasseigne, 93-2661 (La.7/5/94), 640 So.2d 1305; Stobart v. State Through Dept. of Transp. and Development, 617 So.2d 880 (La.1993); Toston v. Pardon, 36,880 (La.App.2d Cir.5/14/03), 847 So.2d 119, 129, writ granted, XXXX-XXXX (La.11/7/03), 857 So.2d 506.
Although Schumpert asserted at trial that suicide was the cause-in-fact of Hardman's fall, the trial court rejected that argument. In view of Dr. Borne's testimony and the strong presumption against suicide, we do not find that the trial court was clearly wrong in its conclusion that Hardman did not commit suicide. With that fact issue resolved, Schumpert was a cause-in-fact of the accident because its negligence in allowing Hardman to be locked out of the building on the catwalk probably caused Hardman to venture onto the roof. The trial court likewise could reasonably conclude that the accident would not have occurred but for Schumpert's negligence in failing to warn and direct Hardman regarding the exit to the roof.

Scope of Duty
In the duty-risk analysis, the scope of protection (legal cause) inquiry is a question of policy that determines whether the particular risk falls within the scope of that duty. Rules of conduct are designed to protect some persons under some circumstances against some risks. The scope of protection inquiry asks whether the enunciated rule extends to or is intended to protect this plaintiff from this type of harm arising in this manner. Faucheaux, supra. In determining the limitation to be placed on liability for the defendant's substandard conduct, the proper inquiry is often how easily the risk of injury to the plaintiff can be associated with the duty sought to be enforced. Hill, supra. The extent of protection owed to a particular plaintiff is determined on a case by case basis to avoid making a defendant an insurer of all persons against all harms. Todd v. State, Dept. of Social Services, Office of Community Services, 96-3090 (La.9/9/97), 699 So.2d 35. The fact that a precise manner of harm is not anticipated does not destroy the scope of the duty when the general manner of harm is foreseeable. Cay, supra.
The standard of care which imposes the duty on Schumpert to warn of the locking exit door and to direct persons across the catwalk to exit the roof does encompass *399 the risk which resulted in Hardman's death. The best explanation of Hardman's plight from the plaintiff's perspective is that he mistakenly exited onto the roof and allowed the door to close before fully appreciating his location. Not realizing his ability to continue on the catwalk to safety, Hardman climbed over the handrailing. At that point, he may have attempted to gain the attention of persons by stopping by the fifth floor hall windows. Failing that, he crossed to an area of the roof that provided easy access to lower levels. He first went down to a lower level of the building by negotiating the smaller sub-roof of an enclosed area between the floors. Hardman's effort at this point may have been to get closer to the edge of the building to attract attention to himself from persons below in a ground-level parking lot. This 82 year old man then apparently chose to sit on the ledge of the roof to achieve his goal of attracting help. That he sat rather than leaned his elderly body over the edge does not remove this risk from Schumpert's scope of duty.
We find that Schumpert's duty to correctly sign the door and walkway does include the risk that an 82-year-old man, hospitalized for pneumonia and inadvertently trapped on the roof, would attempt to signal passersby from the edge of the roof.[4]

Comparative Fault
Pursuant to Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La.1985), the trier of fact will compare the relative fault of the parties in the assessment of liability. In assessing comparative fault, the following factors should be considered: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Watson, supra. The trier of fact's allocation of fault is a factual determination subject to the manifest error rule. Priest v. City of Bastrop, 34,841 (La.App.2d Cir.7/11/01), 792 So.2d 80.
After a careful review of the record, we find no manifest error in the trial court's assessment of 35% fault to Hardman, who was alert and oriented just prior to his fatal fall.

Hearsay Evidence
The defendant complains that Dr. Borne's reading of his observations to the court that he recorded two days after the accident was impermissible hearsay. Absent an abuse of discretion, an appellate court will not overrule a trial court's evidentiary determinations. Bond v. Brookshire Grocery Co., XXXX-XXXX (La.App. 3d Cir.4/4/01), 782 So.2d 707. Allowing the doctor to read his recorded recollection was not an abuse of the trial court's discretion in this bench trial.

Damages
The plaintiff complains that the $25,000 damages for the wrongful death action were too low.[5] These damages are on the lower end of the possible damages *400 awardable; however, considering Hardman's age and health, the trial court's award of $25,000 was not an abuse of discretion.

CONCLUSION
The judgment of the trial court is affirmed. Costs of this appeal are assessed against the appellant.
AFFIRMED.
CARAWAY, J., dissents with written reasons.
CARAWAY, J., dissenting.
I respectfully dissent from the majority ruling since I find that Schumpert was not at fault.
Before discussing the issue of legal cause upon which I would decide this case, two facts need further explanation and emphasis. According to the trial court, the decedent, Hardman, was "alert as to person, time and place," exhibiting no disorientation or suicidal depression. He was able to drive his car without glasses and was expected to leave the hospital the next day. Thus, the trial court found him capable of being held to the standard of a reasonable person with full appreciation of the danger of the three-story precipice upon which he chose to sit. Next, the facts reveal that immediately below the ledge where Hardman sat was a large roof area of a lower portion of the hospital. The area beyond the building where bystanders may have been in a parking lot could be seen completely without nearing the edge of the roof. No reasonable person could calculate that sitting in that location enhanced the possibility of being rescued.
This case might be decided on the cause-in-fact inquiry of the duty/risk analysis since it can be said that Hardman's act was an independent, casually active event divorced from Schumpert's malfeasance. A better explanation is gained by exploring the extent of Schumpert's duty through the analysis of legal cause.
The most important expression of law in the majority opinion, both from the standpoint of duty and legal cause, is that "it is only that conduct which creates an appreciable range of risk for causing harm that is prohibited." Hill v. Lundin Associates, Inc., 260 La. 542, 256 So.2d 620 (1972). In this case, we formulate a rule of conduct or duty that Schumpert should not trap persons by the locking door in question and lack of directions for exiting across the roof. Schumpert's breach of that duty presented risks to persons like Hardman, who, in non-emergency situations, might injure themselves while impatiently attempting to get back into the building by climbing over the handrailing of the catwalk. Injury might also occur from exposure to the elements or from physical exhaustion to a patient who is forced to negotiate the long exit path across the roof and down the stairwell to the ground. These examples outline an appreciable range of risk for causing harm which may be easily associated with this roof entrapment. It should be noted that some of the risks may result because of the concurrent fault of the injured plaintiff. Such fault is foreseeable since a trapped person may in bewilderment, frustration or haste take an ill-advised action that contributes to his injury. The rulings cited in footnote 4 of the majority opinion might be criticized for their failure to consider the foreseeability of the plaintiffs' bewilderment and to use comparative fault principles.
Nevertheless, because substandard conduct does not render the actor liable for all consequences spiraling outward until the end of time, the concept of legal cause [scope of the duty] in the duty-risk analysis *401 is necessary to cut off liability at some point. Roberts v. Benoit, 605 So.2d 1032, 1052 (La.1991). Legal cause considers whether "too much else has intervened time, space, people, and bizarreness." Id. at 1058. A risk may be found not within the scope of a duty where the circumstances of that injury to the plaintiff could not reasonably be foreseen or anticipated, because there was no ease of association between the risk of that injury and the legal duty. Lazard v. Foti, 02-2888 (La. 10/21/03), 859 So.2d 656, 661.
In this case, Hardman was not harmed in or around the exit area under circumstances which might be anticipated as outlined above. He had actually descended one floor down from the level of the first roof of his entrapment. The last action of Hardman that led to his death involved the most risky action of stooping to the level of his feet and sitting down on the edge of the building three stories above the next roof level. This must be viewed as nothing less than a deliberate encounter of a great risk. Without attempting to sit down, a person would be completely aware of the danger upon reaching the marble ledge of the building. Before sitting or, at the least, while stooping to sit, Hardman could peer over the side of the building and see that there was no one immediately below to help him and that a fall from that height would kill him. The testimony of Dr. Borne indicates that Hardman chose to sit with his legs dangling over the side of the building for a considerable length of time without falling, yet without attempting to secure himself back on the roof. Hardman's actions, therefore, at the dangerous edge of the building fall far outside the scope of Schumpert's duty to not trap people upon the roof through the unmarked exit. There is no ease of association between that great risk which he created and the rule giving rise to Schumpert's duty.
The majority's ruling might find support in the argument that Hardman's act must only be viewed as "assumption of risk." Therefore, since our supreme court has indicated that the old doctrine of assumption of risk has been subsumed into the comparative fault system of our law, Socorro v. City of New Orleans, 579 So.2d 931 (La.1991), Murray v. Ramada Inns, Inc., 521 So.2d 1123 (La.1988), a victim's actions in relation to the predicament caused by the defendant's substandard conduct can never bar at least partial recovery. Such absolutism is out of place in our tort law where the endless variety of factual circumstances requires a more thorough and less rigid analysis. Before fault can be compared between the defendant and plaintiff, the defendant must first be determined to be at fault. Therefore, the analysis of legal cause regarding the defendant's conduct remains a relevant inquiry which has not been abrogated by comparative fault. Oster v. State, Dept. of Transp. and Development, 582 So.2d 1285 (La.1991).
The jurisprudential blending of the former assumption of risk defense into comparative fault holds that a victim's careless disregard of the risk not be used to formulate the conclusion that the defendant is free from fault. In Cay v. State, Dept. of Transp. and Development, 93-0887 (La.1/14/94), 631 So.2d 393, despite the decedent's intoxication, the DOTD's duty to build a bridge railing higher than the center of gravity of most pedestrians was held to encompass the risk that any pedestrian, whether impaired by alcohol or not, might accidently stumble and fall over the low railing. The court discussed the primary risk of falling off the bridge as follows:
Here, the general manner of harm was foreseeable. The fact that the precise manner of harm (an intoxicated person's staggering or being frightened toward a *402 bridge railing) may not have been anticipated does not break the claim of causation. W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 43 (5th ed.1984). There is an ease of association between an accidental fall over the railing of a bridge and the failure to build the railing to a height above an average person's center of gravity.
Id. at 399.
In Cay, the risk which the victim assumed was his crossing of a bridge which had an obviously deficient guard rail. His was a careless disregard of the risk of harm and his carelessness was exacerbated by his intoxication. Nevertheless, he was not barred from recovery since falling from the bridge was the "general manner of harm" which the DOTD's duty was aimed to prevent. In this case, Schumpert's duty not to trap persons on the roof did not present the extreme risk created by Hardman's choice to sit on the edge of the building. That risk which Hardman encountered was entirely of his own making.
Accordingly, I do not find that our law of comparative fault rigidly mandates in every instance partial recovery to the injured party who deliberately assumes a great risk. The risk that is assumed by the plaintiff must be one that has arisen in relation to the defendant's breach of duty and only then will comparative fault principles apply.

APPLICATION FOR REHEARING
Before BROWN, GASKINS, CARAWAY, DREW, and MOORE, JJ.
Rehearing denied.
CARAWAY and MOORE, JJ., would grant rehearing.
NOTES
[1] Four other plaintiffs claiming to be the illegitimate children of Hardman were dismissed from the suit in Thomas v. Sister of Charity of the Incarnate Word, XXXX-XXXX (La.7/8/98), 713 So.2d 466.
[2] These facts formed the basis for Schumpert's claim that Hardman committed suicide.
[3] The plaintiff does not argue that Schumpert breached any duty of monitoring Hardman in a much closer manner due to a state of disorientation. The evidence does not show that he was disoriented or that he should have been prevented from ambulating freely in the hallway of the hospital.
[4] See and compare Fowler v. State Farm Fire & Cas. Ins. Co., 485 So.2d 168 (La.App. 2d Cir.1986), writ denied, 487 So.2d 441 (La. 1986), and Freeman v. Julia Place Limited Partners, 95-0243 (La.App. 4th Cir. 10/26/95), 663 So.2d 515, writ denied, 95-2808 (La. 1/26/96), 666 So.2d 680.
[5] While the plaintiff challenged the wrongful death damages as inadequate in its answer to appeal, he did not complain of the survival action award.