874 So.2d 791 (2004)
Annette TOSTON, as Curatrix of Syvella Toston and Tutrix of Tyra Toston
v.
James D. PARDON, Nelson R. Carr, Progressive Security Insurance Company, Illinois National Insurance Company, State Of Louisiana, through Department of Transportation and Development.
No. 2003-C-1747.
Supreme Court of Louisiana.
April 23, 2004.
*794 TRAYLOR, J.
We granted this writ to determine whether the court of appeal performed its review under the proper standard. For the foregoing reasons, we find that the court of appeal misapplied the manifest error standard of review. Accordingly, we find that the trial court was not manifestly erroneous in finding that the State of Louisiana, through the Department of Transportation and Development ("DOTD"), was a cause-in-fact of the plaintiff's injuries. We also find that the trial court was manifestly erroneous in finding that defendant, James Pardon, an intoxicated driver who failed to yield the right of way, was not negligent. Accordingly, we reapportion Pardon's fault to 20% and DOTD's fault to 80%.

FACTS AND PROCEDURAL HISTORY
This automobile accident occurred at the "T" intersection of Lanes Ferry Road on State Hwy. 2 near the Bayou Macon Bridge in East Carroll Parish. At 8:40 p.m. on April 9, 1997, James Pardon ("Pardon"), the driver of a Ford F-350 one ton dually pick-up truck, was approaching the intersection traveling north on Lanes Ferry Road. He testified that he observed the stop sign and stopped. Pardon then proceeded to make a left turn onto Hwy. 2 and collided with a 1987 Mercury Cougar driven by Nelson Carr ("Carr"). The guest passenger in Carr's vehicle, Syvella Toston ("Syvella"), was severely injured.
Syvella's mother, Annette Toston, in both her capacity as curatrix of her daughter, and as tutrix of her granddaughter, sued the drivers of both vehicles and their respective insurers, the East Carroll Parish Police Jury, and DOTD. Pardon, his insurer, and the police jury were dismissed prior to trial, leaving the DOTD as the only remaining defendant at trial.
DOTD is the custodian of the east-west Hwy. 2 and is responsible for the signing of the intersection, which requires the Lanes Ferry Road traffic to stop. The dimensions for the accident scene reveal that Bayou Macon Bridge is located approximately 160 feet to the west of the intersection. The bridge is 207 feet long. The south railing of the bridge rises to a height of 36 inches above the deck of the bridge. Lanes Ferry Road rises up at a slope as it extends onto the right of way for Hwy. 2 to the intersection. The stop sign on Lanes Ferry Road is located down the slope approximately 27 feet from the intersection.
At the time of the accident, Pardon was on his way home from Sweet Pea's Bar. He spent the afternoon and evening there, playing video poker, drinking beer and at one point, eating some pizza. Pardon knew the Lanes Ferry Road vicinity well because he had a hunting camp in the area.
Officer Harwell, the state trooper investigating the accident, testified that he smelled a strong odor of alcohol about Pardon. Pardon was taken first to the hospital in Lake Providence and then to the North Monroe Hospital, where a blood sample obtained at 11:55 p.m. revealed a blood alcohol level ("BAL") of 0.15g% alcohol. At trial, DOTD's expert toxicologist testified that another blood sample drawn *795 earlier (at 10:10 p.m.) was 0.227g% alcohol. Using the two BAL figures, the toxicologist extrapolated the range of Pardon's BAL at the time of the accident to have been between 0.215g% and 0.293g% alcohol, which he characterized as "grossly intoxicated."
After the accident, Pardon consistently maintained that, in spite of his intoxication, he remembered stopping at the intersection and looking both ways on Hwy. 2 before attempting the left turn. Pardon actually described stopping twice in his deposition testimony. The first time was back from the intersection at the stop sign. He then indicated that he eased forward and stopped a second time. To show where he last stopped, during a pre-trial deposition, Pardon marked a red "X" on a photograph to show the location of his truck's front bumper about three feet from the intersection. He identified the photo at trial and again indicated that location as an approximation of his final stopping point.
Pardon testified at trial that the only headlights he saw as he made his stop at the intersection were on the far west side of the bridge. On that opposite side of the bayou, another parish road traverses Hwy. 2 north and south and apparently a store or other place of business is located off the road. Pardon testified that he thought the car headlights turned off at the other parish road. As to what he remembered seeing moments before the collision, Pardon admitted that he had thought "at one time that [Carr] did not have his lights on." Describing his entry into the intersection, Pardon answered as follows:
Q. Now. The first time you stopped, did you look for traffic?
A. Yeah.
Q. Which way did you look?
A. Looked back toward East Carroll.
Q. That'd be to your right?
A. Yeah.
Q. Did you look to your left?
A. Yeah.
Q. Did you see any headlights or any lights of an approaching vehicle on Hwy. 2 from your left?
A. When I looked that time, I pulled up again, then, I looked toward East Carroll again and I looked back, and I thought I seen something coming, but it, you know, it just disappeared and I just eased out there and that's when we had the wreck.
Q. I want to make sure I understand the sequence. You pulled up to the stop sign. You say you looked right and left at the stop sign. You saw no lights. Is that correct? Do I understand that right?
A. Yep. (Yes)
Q. Then, you say you pulled up at or around where you marked the × in that photograph I just showed you, DOTD-58. You said you looked to your left?
A. Toward East Carroll, yeah.
Q. To your right and then again to your left?
A. And, I looked to my left and then, I started easing out and that's when we had the wreck.
Plaintiff's highway safety design expert, Dr. John Glennon, testified that the proximity of the bridge to Lanes Ferry Road, the opaqueness of the bridge railing, the overall geographical terrain, and relatively low elevation of Lanes Ferry Road, all coalesced to effectively "hide" an eastbound car proceeding down Hwy. 2 from the view of a driver proceeding down Lanes Ferry Road. He stated that the sight problem, primarily caused by the bridge's railing, exists when the driver's point of vision is from 15 to 30 feet away from the intersection.
*796 Dr. Glennon discussed the safety standards for the design and regulation of the highway intersection established by the American Association of State Highway and Transportation Officials ("AASHTO"). He stated that the AASHTO standard for the driver's observation point while stopping at an intersection is 20 feet from the edge of the pavement of the intersection roadway (hereinafter the "AASHTO Location"). That standard takes into account the fact that a motorist may not always stop at the nearest location to the intersection where his field of vision would be best. From that point on Lanes Ferry Road, Dr. Glennon determined the intersectional sight distance for an object approaching the intersection at the height of the headlights of the Carr vehicle. The average driver sitting at an eye level of 3½ feet above the ground at the AASHTO Location could only see easterly a distance of 320 feet to a point on the west end of the bridge. Beyond that point, the bridge railing would block the driver's vision of the headlights. According to Dr. Glennon, AASHTO recommends 550 feet of sight distance for the intersection.
Dr. Glennon testified that the State could compensate for the lack of sight distance by posting a 35 mph advisory speed on Bayou Macon Bridge, which would be an appropriate speed for the 320 foot sight distance; paint a stop bar that would be at a point close enough to the intersection so that drivers can see down Hwy. 2; or install a large fish-eye mirror which would allow drivers to see approaching traffic in those places where visibility poses a problem.
In the DOTD's cross-examination of Dr. Glennon and the plaintiff's other highway safety design expert, Dr. Morris Bronstadt, an issue was raised regarding the utilization of two AASHTO factors. First, while AASHTO utilized a standard driver eye height of 3 feet 6 inches, Pardon's eye height in his large truck was 5 feet 3 ½ inches. Dr. Glennon, however, testified that Pardon's enhanced eyesight in his truck would give him a sight distance of more than 320 feet, but nowhere near the 550 feet recommended by AASHTO. Second, AASHTO allows for a 51-inch object height for the oncoming vehicle and makes no distinction for determining the sight distance in daylight or darkness. This object height roughly corresponds with the top of the Cougar in this case, which is 53 inches high. Nevertheless, Dr. Glennon's 320-foot sight distance calculation was based upon a 3 ½ foot driver eye height and an object height of only 26 inches, which corresponded to the headlight height of the Cougar. At the AASHTO Location twenty feet from the intersection, Dr. Bronstadt's distance calculation for seeing the top of the Cougar was 530 feet from the 5-foot 3½ inch vantage point of Pardon's truck. Dr. Bronstadt also admitted on cross examination that one section of the AASHTO standards handbook contains a statement indicating that the beams of a headlight can be seen farther at night than the top of the car can be seen during daylight, but qualified this testimony because in his opinion the bridge railing would hinder a motorist's ability to continuously see the headlights.
DOTD's expert in accident reconstruction, Dr. Mike James, testified that, based on his SMACK reconstruction,[1] Carr's vehicle *797 was going 45-55 mph and Pardon's truck was going 18-22 mph at the time of impact. He testified that the vehicles were turned at an angle when they collided, and that the damage in the side of the Cougar was caused by the forward momentum of Pardon's truck. Pardon's truck "rode up on" Carr's vehicle, crushing the "A pillar," which attaches the roof to the hood of the car, eighteen inches. A cap or lug nut from the truck's front tire was imbedded in the door of the Cougar. The truck's right front tire flattened on impact, leaving gouge marks near the centerline of the road. According to Dr. James, the impact occurred very close to the centerline Hwy. 2. The force of Pardon's truck, which weighed 5,700 pounds empty and was also carrying an arc welding machine in the cargo bed that day, moved the Cougar sideways, bringing it to rest in a ditch. Pardon's truck spun around and ultimately came to rest farther down Lanes Ferry Road. Dr. James estimated the truck's post-impact speed at 5 to 10 miles per hour as it rolled back down Lanes Ferry Road.
Dr. Glennon testified that in his opinion, the physical evidence of the collision indicated that Pardon's truck was traveling at approximately 5 to 8 mph as he pulled out onto Hwy. 2. Dr. Glennon disputed the SMACK's results and testified that based on his calculations, if the truck was traveling at 22 mph, the car and the truck would have ended up in different positions, farther to the north. He characterized the collision between the pick-up truck and the Cougar as "ha[ving] all of the characteristics of a vehicle that has pulled out from a side road at a very slow speed ..." and that the slow speed of Pardon's truck tended to suggest that Pardon had stopped before entering the intersection. On the other hand, when Dr. James employed Dr. Glennon's estimate of 6.7 mph for Pardon's truck into the SMACK program, the resulting collision produced a maximum crush of six inches on the Cougar door, compared to eighteen inches of actual crush produced by the accident.
Dr. James also conducted two tests which were presented on a video tape showing vehicles moving along Hwy. 2 at night. The camera was located in two positions on Lanes Ferry Road, one at the stop sign where the sight distance would be approximately 27 feet from the intersection (hereinafter the "Stop Sign Location"). The other sight location was 10% feet from the intersection which would have been the nearest stopping point to the intersection (hereinafter the "Nearest Location"). At the Nearest Location, which would place the front of the truck three feet from the intersection, the video showed that the oncoming vehicle lights would have been almost constantly within view well beyond the western end of the bridge and visible for over twelve seconds.
Plaintiff additionally presented evidence that DOTD had notice of problems with the Bayou Macon Bridge as early as 1972, when the East Carroll Police Jury requested a "study of the inability to view eastbound traffic" on the bridge. Former state representative, Jess Smith, and James McDaniel, formerly the parish highway superintendent, testified at trial concerning the above problems with the intersection. Mr. Smith sent a letter to the DOTD administrator advising that church members at the Lanes Ferry Road Baptist Church, situated at the corner of the intersection, experienced accidents at that intersection and asking that the DOTD eliminate the problem. Additionally, the pastor and a deacon from the Lanes Ferry Road Baptist Church testified about their concern over the possibility of accidents caused by the "blind spot" on the bridge. Finally, Ronald Pippen and Greg Johnson, both local farmers who *798 lived nearby, testified about a "near miss" accident that they had one night as they pulled onto the highway from the parish road.
At trial, plaintiff argued that the sight obstruction at the bridge was the sole cause of the accident as it presented the same danger for both sober and drunk drivers and that the accident would have occurred even if Pardon had been sober. After a five-day jury trial and two hours of deliberations, the jury found that DOTD was negligent, assigning the State 100% fault for the accident. Pardon and the parish were found to be without fault. The jury awarded damages totaling $11,097,935.31. Thereafter, because of adjustments by the trial court to the past medical damage award and to the general damage awards pursuant to the statutory cap set forth in La.Rev.Stat. 13:5106, the total judgment was reduced to $7,127,964.99.
The DOTD appealed the judgment and the court of appeal, in an en banc decision, reversed and found Pardon to be 100% at fault in causing the accident. Toston v. Pardon, 36,8800 (La.App. 2 Cir. 5/14/03), 847 So.2d 119.[2] The court of appeal found that the jury was manifestly erroneous to conclude that Pardon was not the cause-in-fact of the accident, stating:
First, at the 20-foot AASHTO Location, the line of sight which Pardon had available extended back to the west, almost to the end of the bridge, 320 feet and more. That indicates that the sight problem existing at the intersection was only a partial factor in Pardon's ability to recognize the movement of traffic in his negotiation of the intersection after stopping at that point. He was not totally blinded, and as his truck would have begun its movement forward to the intersection from that point, he would be able to see the Carr vehicle. It is unreasonable to view the evidence as establishing that Pardon had no opportunity to see the approaching vehicle as he stopped or moved slowly within the final 20 feet before reaching the intersection.
Therefore, as his testimony indicates, he knew that he could not reach a safe point for viewing traffic on Hwy. 2 until he stopped at the nearest point to the intersection. Third, a stopping point so that Pardon's vision was at the 20-foot mark or further back near the stop sign establishes the more significant fact that he did not stop at the point nearest the intersection where his vision upon stopping would be completely unimpaired. Fourth, Pardon's vision, his attentiveness, and his response time, more probable than not, were impaired by the effect of his intoxication. (Emphasis in original).

DISCUSSION
We granted writs in this case primarily to review whether the court of appeal correctly applied the manifest error standard in reviewing whether DOTD was a cause-in-fact of the accident.
In a tort action against DOTD, whether based on strict liability or negligence, the plaintiff must show: (1) the property which caused the damage was in the custody of the DOTD; (2) the property was defective because it had a condition that created an unreasonable risk of harm; (3) DOTD had actual or constructive notice of the risk; and (4) the defect in the *799 property was a cause-in-fact of the plaintiff's injuries. Bessard v. State, Dep't. of Transp. & Dev., 94-0589, p. 3 (La.11/30/94), 645 So.2d 1134, 1136. The analysis under either theory is the same. Id. In this case, there is no dispute that DOTD had custody of Hwy. 2 and had knowledge of a possible defect in the intersection as early as 1972.
DOTD's Liability
The DOTD has a duty to maintain the public highways in a condition that is reasonably safe for persons exercising ordinary care and reasonable prudence. Cormier v. Comeaux, 98-2378, p. 6 (La.7/7/99), 748 So.2d 1123, 1127. This court has stated that the DOTD's duty is to design and provide a controlled intersection that did not present an unreasonable risk of harm to motorists. Lasyone v. Kansas City Southern R.R., 00-2628 (La.4/3/01), 786 So.2d 682. DOTD has no duty to bring old highways up to modern AASHTO standards, unless a new construction or major reconstruction of the highway had taken place. Aucoin v. State Through Dep't. of Transp. & Dev., 97-1938, 97-1967 (La.4/24/98), 712 So.2d 62. Nevertheless, DOTD has a duty to correct conditions existing on old highways that are unreasonably dangerous. Cormier, 748 So.2d at 1131.
Initially, we affirm the trial court's finding that the DOTD presented an unreasonably dangerous condition. Both the jury and the court of appeal found that this intersection presented an unreasonably dangerous condition, and that finding is supported by the record. The testimony of Dr. Glennon and Dr. Bronstadt clearly establishes that the opaqueness of the bridge railing, the dip in the highway before it before it reaches the bridge, and the indication that the stop sign location is inadequate to provide a motorist with guidance on the optimal stopping location in order to see clearly down Hwy. 2 coalesce to establish an unreasonably dangerous intersection. The testimony from both lay and expert witnesses was unanimous that a driver had to proceed with much caution in order to cross the intersection safely. Accordingly, the intersection at Lanes Ferry Road and Hwy. 2 presented an unreasonable risk of harm.
Plaintiff primarily argues that the court of appeal misapplied the standard of review by recreating its own version of facts based on its interpretation of conflicting evidence. Accordingly, plaintiff asserts that the court of appeal erroneously overturned the jury decision that the defect on Hwy. 2 was the cause-in-fact of the accident. We agree that the court of appeal erroneously applied the manifest error standard of review and that the intersection at Hwy. 2 and Lanes Ferry Road contained a defect which was a cause-in-fact of the accident.
The initial inquiry to determine if a party may be liable under the duty-risk analysis is cause-in-fact. Netecke v. State, through Dep't. of Transp. & Dev., 98-1182 (La.10/19/99), 747 So.2d 489, 497 A party's conduct is a cause-in-fact of the harm if it was a substantial factor in bringing about the harm. Id. at 498. The act is a cause-in-fact in bringing about the injury when the harm would not have occurred without it. Id. While a party's conduct does not have to be the sole cause of the harm, it is a necessary antecedent essential to an assessment of liability. Id.
Whether an action is the cause-in-fact of the harm is a factual determination that is left to the factfinder. In Mart v. Hill, 505 So.2d 1120 (La.1987), this court posited a two-part test for the appellate review of facts:

*800 (1) The appellate court must find from the record that there is a reasonable factual basis for the finding of the trial court, and
(2) The appellate court must further determine that the record establishes that the finding is not clearly wrong or manifestly erroneous.
When the district court has allowed both parties to present their experts before making its factual determinations, the factfinder's choice of alternative permissible views cannot be considered to be manifestly erroneous or clearly wrong. Stobart v. State, Dep't of Transp. & Dev., 617 So.2d 880, 883 (La.1993). However, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error even in a finding purportedly based on a credibility determination. Id. at 882.
Our review of the record convinces us that the jury was presented with ample evidence with which to reasonably conclude that the sight obstruction was a cause-in-fact of the accident. The court of appeal relied heavily on Dr. James video nighttime study which demonstrated the driver's field of vision for the movement of a car proceeding easterly along Hwy. 2. However, the jury could have reasonably relied on plaintiff's rebuttal concerning the questionable quality of both videos, and a background conversation in which the cameraman asked Dr. James whether the second video was better. The jury could have reasonably inferred from the background voice in the second video tape that Dr. James attempted multiple times to get the almost unobstructed view that the final video presented. Moreover, as plaintiff noted on cross examination, the approaching vehicle disappears from sight in both videos for roughly five to seven seconds, which confirms the testimony of Dr. Bronstadt and Dr. Glennon to the effect that the bridge railing hides the headlights of an approaching vehicle, if only momentarily.
Additionally, the court of appeal emphasized that some testimony revealed that Pardon would have been able to continually see the vehicle from the Nearest Location without taking into account that the jury heard conflicting evidence on this issue at trial. According to Dr. Bronstadt, plaintiff's expert in bridge design, the guard railing would continue to obstruct a driver's view of the headlights even at the Nearest Location. Dr. Bronstadt opined that, just because a motorist can see the top of the car in daylight does not mean that they are going to see the headlights, particularly at night and particularly where a sight obstruction such as a guardrail exists. Photographs of the accident scene confirm that the intersection was not well-lit; a motorist would be unlikely to see the top of a vehicle under the circumstances. The jury could have reasonably relied on the fact that this was a nighttime accident; and inferred from the evidence that Pardon could not see the tops of other vehicles in the poorly lit intersection.
Moreover, Dr. Glennon, on cross-examination, only admitted that Pardon may have had the "opportunity" to see the car in time to judge whether there was sufficient time to pull out. Dr. Glennon never testified that he thought Pardon had a full, clear unobstructed view from his eye height at the Nearest Location. The fact that Pardon had an "opportunity" to see the Carr vehicle does not conflict with testimony and video footage that, at the Nearest Location, a person with Pardon's eye height may be able to see headlights appear and then momentarily disappear, if he was looking at the right moment.
*801 Even at the AASHTO Location, the record contains conflicting evidence which the jury may have reasonably relied. According to the court of appeal, Dr. Glennon's testimony regarding the sight obstruction under AASHTO standards does not apply to Pardon because Dr. Glennon's calculation did not employ Pardon's 5 foot 3 ½ inch observation height and only considered the view of the 26 inch headlights of the Carr vehicle. However, this rationale does not take into account that Pardon's vehicle was weighed down with an arc welding machine, located in the cargo bed. The court of appeal also overlooked Dr. Glennon's testimony that, even at Pardon's enhanced position at 5 foot 3 ½ inches, Pardon would not have the AASHTO recommended 550 feet of sight distance. Although Dr. Glennon admitted that Pardon would have a sight distance of more than 320 feet, he believed that Pardon's sight distance would be nowhere near the 550 feet recommended by AASHTO. Dr. Glennon also testified that Pardon would have had to be 40 or 50 feet back from the intersection in order to see the headlight beams continuously through the bridge rail.
After hearing from numerous expert and lay witnesses on both sides, the jury concluded that the sight obstruction was a cause-in-fact of the accident. Therefore, the court of appeal misapplied the standard of review by completely rejecting the reasonable basis in the record to support the jury's finding that DOTD was a cause-in-fact of the accident. Following our review of the record, we find no manifest error in the jury's finding that plaintiff's accident was caused in part by DOTD's breach of a duty it owed to the plaintiff. Accordingly, we reverse this portion of the court of appeal decision.
Pardon's Liability
DOTD contends that the trial court erred in not assessing any fault to Pardon for the accident despite evidence presented that he was severely intoxicated and familiar with the area. We agree and find that Pardon's negligence was a substantial factor which contributed to the accident.
To determine Pardon's liability for this accident, the duty-risk analysis requires proof that: (1) the defendant had a duty to conform his conduct to a specific standard; (2) the defendant's conduct failed to conform to the appropriate standard; (3) the defendant's conduct was a cause-in-fact of the plaintiff's injuries; (4) the defendant's substandard conduct a legal cause of the plaintiff's injuries; and (5) proof of actual damages. Boykin v. Louisiana Transit Co., Inc., 96-1932 (La.3/4/98), 707 So.2d 1225, 1230.
In this case Pardon had a duty to yield the right of way to all vehicles which are approaching so closely as to constitute an immediate hazard. La.Rev. Stat. 32:123(B) defines the duty of the motorist approaching an intersection regulated by a stop sign:
Except when directed to proceed by a police officer or traffic-control signal, every driver and operator of a vehicle approaching a stop intersection indicated by a stop sign shall stop before entering the cross walk on the near side at a clearly marked stop line, but if none, then at the point nearest the intersecting roadway where the driver has a view of approaching traffic on the intersecting roadway before entering the intersection. After having stopped, the driver shall yield the right of way to all vehicles which have entered the intersection from another highway or which are approaching so closely on said highway as to constitute an immediate hazard. (Emphasis added.)
*802 The jurisprudence indicates that stopping is only half the duty, the other half is not to proceed until the determining that the way is clear. Guillot v. Valley Forge Ins. Co., 99-1044, p. 4 (La.App. 3 Cir. 12/8/99), 753 So.2d 891, 894. The second duty is heavier and requires an even greater degree of care when the intersection is blind, or partially obstructed. Continental Ins. Co. v. Duthu, 235 So.2d 182, 186 (La.App. 4 Cir.1970). A driver entering a superior highway where his view is obstructed is under a duty to proceed with extraordinary caution. Taylor v. State, 431 So.2d 876, 879 (La.App. 2 Cir.1983). A left turn is one of the most dangerous maneuvers a motorist may execute and, before attempting, a motorist must ascertain whether it can be completed safely. Theriot v. Lasseigne, 93-2661, p. 8 (La.7/5/94), 640 So.2d 1305, 1312.
Moreover, Pardon also had a duty not to drive while intoxicated. Various criminal and civil statutes proscribe the act of driving a motor vehicle while under the influence of alcohol. La.Rev. Stat. 14, Sections 32.1, 39.1, 39.2, and 98. A finding of gross intoxication alone does not mandate a finding of liability and is merely a factor to consider under Louisiana's comparative negligence scheme. Petre v. State ex. rel. Dep't of Transp. & Dev., 01-0876 (La.4/3/02), 817 So.2d 1107, 1114; Briggs v. Hartford Ins. Co., 532 So.2d 1154, 1158 (La.1988).
The breach of duty in this case is clear. The avoidance of accidents still depends on the judgment and capability of the individual driver. Louisiana Rev. Stat. 32:123(B) clearly provides that a motorist approaching an intersection has a duty to yield the right of way to all vehicles approaching on the highway. Pardon testified that he had crossed the intersection many times, that he hunted in the area often, and knew a motorist had to be careful because of the sight obstruction. It is clear from the record that Pardon knew full well of the sight obstruction and the potentially hazardous situation, yet he proceeded into the intersection without first ascertaining whether the headlights from the "turning" vehicle had, in fact, turned. With regard to Pardon's breach of his duty not to drive while intoxicated, the expert testimony was uncontroverted that Pardon's BAL at the time of the accident was that of a "grossly intoxicated" person.
Based on the evidence presented, we also find that Pardon's failure to yield combined with his gross intoxication was a cause-in-fact of the accident. Pardon's own misjudgment, undoubtedly affected by his intoxicated state, in failing to ascertain whether the momentary light was an approaching vehicle establishes that he was a cause-in-fact of the accident. As previously noted, Pardon testified several times at trial that he saw lights appear and then disappear:
Q. Now, Mr. Pardon, I need to know what happened. Did the lights disappear and reappear? Did you see lights before impact? Or, did you not see lights before impact as you continued to look left and ease out into Lanes Ferry Road?
A. I seen lights and then, I didn't see no lights.
Q. And, then, you never saw them again? Is that your testimony?
A. As far as I know, that's the way it was.
This testimony, which was repeated twice at trial, establishes that Pardon failed to yield the right of way to the approaching Cougar. Pardon's testimony is additionally supported by Dr. Glennon and Dr. Bronstadt's opinions that, at Pardon's eye level, the Cougar's headlights would have appeared and then disappeared momentarily due to the sight obstruction presented *803 by the guardrail. Accordingly, we conclude that Pardon's failure to yield the right of way and his gross intoxication was a substantial factor in bringing about the accident.
Thus, we affirm the portion of the court of appeal judgment which finds that Pardon's negligence was a substantial factor in causing this accident.
Apportionment of Fault
Having found that the trial court was clearly wrong in failing to find Pardon at fault for this accident, we must re-allocate fault.
After an appellate court finds a clearly wrong apportionment of fault, it should adjust the award, but only to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion. Clement v. Frey, 95-1119, p. 8-9 (La.1/16/96), 666 So.2d 607, 611. In applying the manifest error standard of review to the factfinder's allocation of fault in Watson v. State Farm Fire & Casualty Ins. Co., 469 So.2d 967, 974 (La.1985), this court stated as follows:
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
Our application of the Watson standards convinces us that the majority of the fault rests with DOTD. Pardon's conduct in traversing the intersection is a less direct cause of the accident when compared to the DOTD's awareness of the danger that the sight obstruction presented to all drivers. Here, the jury clearly found credible Dr. Glennon and Dr. Bronstadt's testimony that the bridge railing effectively "hid" the headlights of the Cougar. Moreover, it is clear that DOTD had knowledge of this danger as early as 1972. By contrast, Pardon's failure to yield the right of way resulted a lesser awareness of the danger involved because his sight was, at the very least, momentarily obstructed by the bridge railing. Moreover, DOTD created a more substantial risk to all drivers by failing to fix the defective intersection employing any number of the simple and inexpensive remedies suggested by Dr. Glennon. It is undisputed that numerous accidents or near misses have occurred at this intersection, creating substantial risk to all drivers who attempt to traverse the highway. Finally, DOTD clearly had superior capacity to prevent the accident by accurately measuring and fixing the sight obstructions to provide the driver with more guidance. When weighing with DOTD's superior capacity to remedy the situation with more accuracy than any individual driver could ascertain, DOTD's knowledge of the defect, and the substantial risk involved each time a driver attempts to maneuver through the intersection, it is clear that the majority of fault rests with DOTD.
*804 Based on our analysis of the Watson factors, we conclude that DOTD was more at fault than Pardon. We find that Pardon was not less than 20% at fault but no more than 50% at fault. Accordingly, we allocate Pardon's fault to 20%, which is the lowest amount the trial court could have reasonably allocated to Pardon, and DOTD's fault to 80%.

CONCLUSION
For the foregoing reasons, we affirm the decision of the court of appeal insofar as it found Pardon's negligence was in part a cause-in-fact of the accident. However, we reverse the court of appeal's failure to assign fault to DOTD, and reallocate fault accordingly. The DOTD and Pardon are determined to be at fault, 80% and 20% respectively. The case is remanded to the district court to confect appropriate monetary judgment based upon the fault percentages.
AFFIRMED IN PART; REVERSED IN PART; REMANDED.
VICTORY, J., dissents and assigns reasons.
WEIMER, J., dissents for the reasons assigned by VICTORY, J.
VICTORY, J., dissenting.
I dissent from the majority opinion because I agree with the court of appeal's decision which found James Pardon, the drunk driver, to be 100% at fault in causing this accident. Toston v. Pardon, 36,880 (La.App. 2 Cir. 5/14/03), 847 So.2d 119.
The intersection of Hwy. 2 and Lanes Ferry Road is certainly not ideal, based on the proximity of the bridge to Lanes Ferry Road, the opaqueness of the bridge railing, and that fact that a car must proceed past the stop sign on Lanes Ferry Road to within 10-15 feet of the intersection in order to see clearly down Hwy. 2. However, Pardon testified that he had traveled this intersection frequently, was familiar with the road at daytime and at nighttime, and was aware of the potential sight obstruction. The expert testimony was uncontroverted that if Pardon stopped where he said he stopped, i.e., the point nearest the intersection, which is where the law required that he stop and where he knew from past experience that he needed to stop in order to see oncoming traffic, he would have seen Carr's vehicle. In addition, all of the lay witnesses testified that if a driver was careful and proceeded with caution, the intersection could be crossed safely. This fact is self-evident as there was no evidence presented that an unusual number of accidents had ever occurred at this intersection. Most significantly, expert testimony established that a person with Pardon's blood alcohol level at the time of the accident, between 0.215g% and 0.293g% alcohol (approximately two and a half times the legal limit), would be grossly intoxicated to such an extent that it would have a thousand fold effect on his attention and reaction time.
Undoubtedly, thousands of people travel this intersection every month, many of them at night, without incident. Yet, this tragic accident occurred because a highly intoxicated driver, familiar with the intersection, simply failed to yield to traffic on Hwy. 2.
Accordingly, I respectfully dissent.
NOTES
[1] SMACK is a computer program developed by the federal government for use by engineers, physicists and accident reconstructors which replicates the mechanics of an accident based on inputting certain variables such as vehicle size and weight, physical damage, and speed; in this case, the program generated a model consistent with the damage pattern on both vehicles and the physical evidence found at the accident scene.
[2] After the DOTD filed its suspensive appeal but before the appeal was heard, the plaintiff and the DOTD entered into a settlement agreement whereby the DOTD paid plaintiff's claims against National Union Insurance Company of Louisiana, the excess insurance carrier for the State.