h CARAWAY, J.
In early 1996, the pick-up trucks driven by Wanda Honey and Larry Gates were involved in a collision in Gates’s lane of travel on a state highway. Honey had consumed alcohol and smoked marijuana before the accident. Gates initially filed suit against Honey. Honey filed a reeon-ventional demand against Gates and also named the Louisiana Department of Transportation and Development (“DOTD”) as a third-party defendant, alleging that the shoulder drop-off at the site of the accident caused the loss of control of the vehicle and the collision with Gates. After settlement of the drivers’ claims between themselves, only Honey’s claim against the DOTD was tried before a jury. The jury assessed Honey with 85% fault and the DOTD with 15% fault and awarded damages. For the following reasons, we reverse the finding of DOTD fault.

Facts

Wanda Honey sued the DOTD after she was involved in a traffic accident with a vehicle driven by Larry Gates. On the afternoon of March 15, 1996, Honey and her boyfriend, John Daugherty, traveled to Crossett, Arkansas to join some of Daugherty’s co-workers for a cookout. On the way to the party, Daugherty purchased a case of beer. He had also brought along a bag of marijuana. Honey testified that she drank at least three beers during the evening and shared two marijuana joints with Daugherty. She had not eaten a full meal that day. Honey and Daugherty left the party about 6:00 p.m. Sometime before 8:00 p.m., after they stopped to get something to eat, Daugherty asked Honey to drive because he was impaired. Honey |2was driving south on Louisiana Highway 142 in Morehouse Parish when the accident occurred.
Honey testified that as she approached a curve, Gates’s vehicle exited the curve traveling north and appeared to be in her lane. Honey veered right, off the shoulder and then jerked her wheel left to get around Gates. At trial, Gates claimed that Honey came into his lane of travel. Gouge marks in the pavement demonstrated that the vehicles collided approximately one to two feet in Gates’s lane.
Photographs of the accident location taken by Honey’s accident investigator six weeks after the accident were submitted into evidence. They depicted a drop-off from the road surface to the shoulder from the point of impact to a distance of 111 feet north ranging from 3-3/8 to 6 inches at the point of impact. A DOTD district manag *1028 er conceded that the drop-off depicted in one photograph would have been fixed as soon as the DOTD was made aware of it.
At trial, the DOTD presented testimony-showing that Highway 142 was first placed in the DOTD system in 1938 and widened and overlaid in 1949, 1952, 1965 and 1981. No work was performed on the shoulder within the three months before the accident, although the accident location was last inspected on March 5, 1996. DOTD personnel routinely inspect the road. Repairs are normally scheduled for shoulder drop-offs of three inches, but at five inches or more, repair is performed immediately.
On the evening of the accident, Trooper Kevin Reeves investigated the site and noted no evidence that Honey left the roadway. He neither | ^reported any shoulder drop-offs nor discovered any skid marks. At trial, DOTD’s expert in accident reconstruction, Dr. Richard Robertson, and Honey’s expert, Danny McGrew, confirmed the lack of such marks.
Gates, Honey and Daugherty were all injured from the accident. Honey’s blood alcohol level was 100 milligrams per deciliter (.10 grams percent alcohol) at 9:55 p.m. Her urine tested positive for both alcohol and marijuana. Gates’s blood alcohol level was negative.
Gates filed suit against Honey and Daugherty and their insurers. Honey reconvened against Gates, his insurer and DOTD. The only claim remaining by the time of trial in 2003 was Honey’s claim against the DOTD. After a four-day trial, the jury ruled in favor of Honey, finding the DOTD negligent for the defective roadway. The jury allocated 85% fault to Honey and 15% fault to DOTD, absolving Gates of any negligence. General damages were awarded in the amount of $51,000, with special damages of $548,000 and lost wages of $151,000. DOTD moved for a judgment notwithstanding the verdict on April 21, 2004. Honey also filed a motion for additur and/or judgment notwithstanding the verdict. The trial court upheld the fault allocation but reduced the special damages to $108,000 and increased the general damages to $200,000. Both parties appeal.

Law

In a tort action against the DOTD, the plaintiff must show: (1) the property which caused the damage was in the custody of DOTD; (2) the property was defective because it had a condition that created an | unreasonable risk of harm; (3) DOTD had actual or constructive notice of the risk; and (4) the defect in the property was a cause-in-fact of the plaintiffs injuries. Toston v. Pardon, 03-1747 (La.4/23/04), 874 So.2d 791. DOTD’s duty is to maintain the public roadways in a condition that is reasonably safe and does not present an unreasonable risk of harm to the motoring public exercising ordinary care and reasonable prudence. Netecke v. State ex rel. DOTD, 98-1182 (La.10/19/99), 747 So.2d 489.
DOTD must maintain the shoulders and the area off the shoulders, within its right-of-way, in such a condition that they do not present an unreasonable risk of harm to motorists using the adjacent roadway and to others, such as pedestrians, who are using the area in a reasonably prudent manner. Id. DOTD’s duty to maintain safe shoulders encompasses the foreseeable risk that for any number of reasons a motorist might find himself on, or partially on, the shoulder. This duty extends not only to prudent and attentive drivers, but also to motorists who are slightly exceeding the speed limit or momentarily inattentive. Id.
Prudent behavior for a motorist who inadvertently drives off the paved road onto the shoulder is to first reduce *1029 speed and then to attempt a gradual reentry after the motorist has regained control of the vehicle. Bozeman v. State, 34,430 (La.App. 2d Cir.4/4/01), 787 So.2d 357, writ denied, 01-1341 (La.6/29/01), 794 So.2d 813. DOTD’s duty to maintain highway shoulders is imposed to protect a motorist from the risk of injury produced by a combination of the motorist’s inadvertent encounter with an unexpected, sharp drop-off from the roadway and his consequent instinctive |sover steering of the vehicle. Id. A motorist’s instinctive overreaction to an unexpected drop-off from a paved highway to its shoulder, produced by a combination of the DOTD’s failure to provide a continuous even surface and the plaintiffs inadvertent straying onto the shoulder, is within the scope of protection of the rule of law which requires the DOTD to maintain safe highway shoulders. Id., citing LeBlanc v. State, 419 So.2d 853 (La.1982).
A driver’s intoxication alone is not enough to automatically prevent recovery for DOTD’s fault. It is merely a factor to be considered in Louisiana’s comparative negligence scheme. Petre v. State ex rel. Dept. of Tramp, and Development, 01-0876 (La.4/3/02), 817 So.2d 1107.[1] The initial inquiry to determine if a party may be liable under the duty-risk analysis is cause-in-fact. Toston v. Pardon, supra. A party’s conduct is a cause-in-fact of the harm if it was a substantial factor in bringing about the harm. While a party’s conduct does not have to be the sole cause of the harm, it is a necessary antecedent essential to an assessment of liability. Id. Cause-in-fact is a “but for” inquiry which tests whether the accident would or would not have happened but for the defendant’s substandard conduct. Perkins v. Entergy Corp., 00-1372 (La.3/23/01), 782 So.2d 606. To satisfy the substantial factor test, the plaintiff must prove by a preponderance of the evidence that the defendant’s conduct was a substantial factor in bringing about the complained of harm. Id. Proof is sufficient to constitute a preponderance of the evidence, when both the direct and cireum-stantial | fievidence establishes that the fact or causation sought to be proved is more probable than not. Talbot v. Talbot, 03-0814 (La.12/12/03), 864 So.2d 590.
Whether an action is the cause-in-fact of the harm is a factual determination that is left to the factfinder. Toston v. Pardon, supra. The appellate court must find that there is a reasonable factual basis for the finding of the factfin-der and must further determine that the record establishes that the finding is not clearly wrong or manifestly erroneous. Mart v. Hill, 505 So.2d 1120 (La.1987). Where documents or objective evidence so contradict a witness’s story, or the story itself is so internally inconsistent or implausible on its face that a reasonable fact-finder would not credit the witness’s story, the court of appeal may find manifest error even in a finding purportedly based on a credibility determination. Toston v. Pardon, supra.

Discussion

In Bozeman v. State, supra, we reviewed the numerous Louisiana cases where a drop-off of the surface of the roadway onto the shoulder was considered an unreasonable risk of harm. In most of those cases, the DOTD was held liable for at least a portion of the fault for the accident. As discussed in Bozeman, the danger posed by such drop-offs is the so- *1030 called “slingshot” effect on the vehicle caused by the driver’s instinctive overreaction to correct his course. Such immediate overcorrection back onto the hard road surface without slowing down may cause a loss of control of the vehicle, sending it into the oncoming lane.
|7In contrast to these cases, the DOTD has also been sued in other settings for the general insufficiency of the width, slope and overall layout of the shoulder and ditches in the right-of-way area beyond the hard surface. See Cormier v. Comeaux, 98-2378 (La.7/7/99), 748 So.2d 1123 and cases discussed therein. Despite the fact that many of these cases involved right-of-way conditions falling below modern standards, the DOTD has not been held liable on policy grounds for older highways with narrow, sloped shoulders. As stated by our supreme court in Myers v. State Farm Mut. Auto. Ins. Co., 493 So.2d 1170, 1173 (La.1986):
... many Louisiana roads have narrow shoulders and steep roadside ditches and are lined with trees, culverts, fences, and other objects.... [I]t would be physically and financially impossible to bring all of the state’s roads up to modern standards.... For this reason, the failure of DOTD to reconstruct the state’s highways to meet modern standards does not establish the existence of a hazardous defect.
Apart from the central controversy in this case regarding the size of the drop-off where Honey’s vehicle left the road and its effect on her vehicle, it is also significant that the photos of the accident scene indicate a relatively narrow, tree-lined shoulder/ditch area which provided Honey little room for emergency maneuvers. Nevertheless, Honey has made no claim against DOTD for this highway condition. In any event, such a claim would not appear to be viable under Myers, supra and Cormier, supra.
DOTD argues that Honey did not establish with physical evidence that her vehicle in fact left the roadway, and accordingly, she never pinpointed the extent of the shoulder drop-off which she allegedly experienced.' Honey’s two accident investigators did not visit the accident |sscene until weeks after the accident. While they were able to identify the point of impact, they found no evidence that Honey’s vehicle left the roadway nor any yaw or scuff marks on the road surface showing her vehicle’s trajectory immediately before impact. Nevertheless, both experts reported on the stretch of the highway immediately before the impact location and the shoulder drop-off range of 3 to 6 inches extending along the edge. McGrew testified that such a drop-off “can play a significant role on one’s ability to control a vehicle.”
Despite DOTD’s argument, when deference is given to the trier-of-fact, the circumstances indicate that an unreasonable risk of harm existed along the stretch of roadway immediately before the collision site because of the persistent drop-off conditions along the edge of the road surface and the shoulder. What particular role the defective drop-off played in the accident, however, presents a more significant cause-in-fact question. Because of the lack of physical evidence of the vehicle’s exit from the highway onto the shoulder and its return, we must examine in detail the eyewitness testimony of the three persons involved in the accident.
In his deposition introduced by Honey, Daugherty stated that he was awake the entire time that Honey drove his truck and that the two talked. Daugherty recalled that just prior to the accident, he began adjusting the radio. When he looked up, he saw “lights coming at us.” Daugherty stated that Gates was “across the line” and *1031 that Honey “steered to the left” in an attempt to miss Gates. Daugherty testified that at no time did the tires of his vehicle leave the roadway. Nor did he perceive anything that led him to 10believe that Honey ran off of the right side of the road before she steered left.
DOTD presented the testimony of Gates, who testified that it was Honey who entered his lane of travel the evening of the accident. Gates recalled there being no other traffic on the roadway. When he first saw Honey’s vehicle, it was in the correct lane of travel. Gates stated that “she didn’t come over too fast. It’s just a drifting into my lane.” He never saw Honey run off her side of the road onto the shoulder. On cross-examination, Gates testified that he went off his side of the road in an evasive manner and that his two right tires left the road.
In Honey’s testimony, she reported seeing Gates’s headlights coming out of the curve and into her lane of travel. She “tried to take evasive action” to get out of her lane and to go to the right and when she did “there was a drop off’ and she “dropped off the road.” Honey further explained that her “wheels jerked.” She remembered thinking that she did not “know what’s in the ditch” because she was unfamiliar with that stretch of Highway 142. She testified that the first thing she thought was that there might be “a tree down there” and that she might hit it. Honey testified that “I guess I jerked my wheel back to the left. I just remember ... the drop off and my wheel jerked and I didn’t know what was in the ditch. So I jerked my wheel back to the left.” She testified that she thought “if there had been a shoulder of the road, I would have been able to maneuver off that road and avoid the accident.” Honey stated that when she pulled her wheel to the left, it was her intention to get back on the road.
l10On cross-examination, Honey admitted that she had never driven Daugherty’s truck before that evening and that she drove at a speed of 50-55 m.p.h. She described her condition that evening as being “high” but not “stoned.” Honey testified that as Gates came out of the curve, he “came into my straightway.” She saw his lights in the left lane and “then gradually coming into my lane.” Honey estimated that Gates was three to five car lengths from her when she first saw his lights drifting into her lane. She could not recall when she first applied her brakes but believed that she did so either in her lane or when she went to the shoulder. When she steered to the right, her truck veered to the right. Honey testified that “everything happened in a matter of seconds.” She “just remember[ed] going off of the shoulder of the road, my two tires dropping down ... thinking I don’t know what’s out there and the thought crossed my mind that I might possibly hit a tree.” She could not see beyond a few feet of the shoulder. She did not know whether her vehicle was five feet off of the paved portion of the road. Honey reiterated that she “tried to take evasive action to go to the shoulder,” but there was no shoulder and the vehicle dropped. She further explained that on the shoulder she:
jerked my wheels back to the left because like I said I didn’t know what was to the right and even though at the time I may have been thinking well, gee, I’ll try to steer around him or whatever. It was just within a matter of seconds so that’s what happened and with that big a drop off of course I wasn’t able to maneuver back around him. With that big a drop off I wasn’t able to maneuver anything.
Finally, Honey stated she believed that since she did not know what was on the right, she would pass Gates on the left. *1032 When she did so, the | ^impact occurred. She testified that if she had “been able to maneuver to a shoulder of the road ... if there had been a shoulder to the road so I was able to maneuver out of his way the accident would never have happened.”
Honey’s claim of leaving the roadway is contradicted by the other eyewitnesses and unsupported by physical evidence. However, mindful of the jury’s right to judge her credibility, we have accepted her version of events.[2] Nevertheless, even when we accept as plausible Honey’s claim to have driven onto the shoulder, there exists insufficient evidence before us to prove more probably than not that the shoulder edge caused Honey to lose control of the truck and collide with Gates’s vehicle. Honey never testified that the shoulder drop-off at the edge between the hard surface and the gravel shoulder caused her to lose control of the truck and propel the vehicle with the so-called slingshot effect into Gates’s lane of travel. The immediate slope of the narrow shoulder caused a drop-off down that slope, but that effect would have first propelled the vehicle away from Gates. At that moment, according to her own account, she became aware of the prospect of a collision into the trees and she jerked her wheel left in order to get back on the road and possibly pass Gates on the left.
This case is much like that of Aetna Cas. and Sur. Co. v. State, through Dept. of Transp. and Development, 97-0716 (La.App. 1st Cir.4/8/98), 712 So.2d 216, writ denied, 98-1241 (La.7/2/98), 724 So.2d 209. In Aetna, Theriot left a bar after consuming ten to twelve beers. As he approached a curve, he glanced to the left to see if a friend was at home and h ¡.the right tires of his vehicle left the roadway. Upon reentering the roadway, Theriot’s vehicle crossed the centerline of travel and struck a truck. In his suit against the DOTD, Theriot alleged that the shoulder drop caused him to “shoot” across the road and into the other lane of travel.
Following trial, the trial court assessed DOTD with 25% fault. The court of appeal reversed the judgment against DOTD, finding that Theriot had failed to prove the existence of an unreasonably dangerous condition or that the drop-off caused the accident. Specifically, the court determined that the physical and eyewitness testimony failed to support Theriot’s claims regarding his losing control of the vehicle as he re-entered the roadway. The trooper who investigated the accident reported that the tracks left by the driver were clearly visible and showed that the driver left the roadway as easily as he entered it, with no evidence that the tires rubbed against the pavement. No physical evidence on the vehicle’s tires supported Theriot’s contentions. In finding the drop-off did not cause the accident, the court concluded:
Although we note the drop-off between the shoulder and highway did reach four inches at some point along Theriot’s path, there was no evidence presented which indicated the four inch drop-off played any part in this accident by creating an obstacle to Theriot’s safe reentry. Theriot’s version of the accident was completely contradicted by the physical evidence presented and the testimony. ...
Id. at 222.
As we initially observed, Honey’s suit against DOTD did not assert that the condition of the narrow shoulder of Highway 142 was substandard and that the DOTD was negligent by failing to widen and im *1033 prove the 11sshoulder area along its right-of-way to comport with modern highway standards. Nevertheless, her reported difficulties controlling the vehicle involved the general condition of the shoulder and its slope toward the nearby trees. She did not testify that the drop-off from the surface of the road to the shoulder was encountered by the truck’s right tires in such a manner causing the loss of vehicle control by the slingshot effect. Instead, she testified to her deliberate maneuver of the vehicle off of the sloping shoulder back onto the road’s surface. Under these conditions, in view of the Myers/Cormier jurisprudence, we find no fault attributable to the DOTD.

Conclusion

We reverse the jury verdict finding DOTD 15% at fault in causing this accident. This determination moots the issues raised by Honey’s appeal regarding the sufficiency of damages. Costs of this appeal are assessed to Honey.
REVERSED.

. The provisions of La. R.S. 9:2798.4, which provides that the state cannot be liable for damages when the operator of a motor vehicle has a blood alcohol of .08 grams percent and is found to be in excess of 25% negligent, became effective after the date of the subject accident.

. Of course, the verdict exonerating Gates indicates that the jury did not believe that Honey was forced off the road surface by Gates.