STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

10-576

KEVIN CAMPBELL, ET UX.

VERSUS

COAST CONCRETE SERVICES, INC., ET AL.

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-20051712
HONORABLE GLENNON P. EVERETT, DISTRICT JUDGE

**********

MARC T. AMY
JUDGE

**********

Court composed of Marc T. Amy, Billy Howard Ezell, and David E. Chatelain*, Judges.

AFFIRMED.

Gary McGoffin
Durio, McGoffin, Stagg & Ackermann
Post Office Box 51308
Lafayette, LA   70505
(337) 233-0300
COUNSEL FOR DEFENDANT/APPELLEE:
    Louisiana Testing & Inspection, Inc.

Lamont P. Domingue
Voorhies & Labbe
Post Office Box 3527
Lafayette, LA 70502-3527
(337) 232-9700
COUNSEL FOR PLAINTIFFS/APPELLANTS:
    Kevin Campbell
    Kim Campbell

---

* Honorable David E. Chatelain participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

AMY, Judge.

The plaintiffs appeal the trial court's judgment finding that they did not prove that the defendants were responsible for the damage to their home's foundation. For the following reasons, we affirm.

## Factual and Procedural Background

The plaintiffs, Kevin and Kim Campbell, began construction on a new home in Lafayette in 2003. They wanted the home to be built on a "post-tension" foundation and hired Coast Concrete Services, Inc. (Coast) to design the foundation. Coast advised the plaintiffs that it needed a geotechnical investigation of the soil on the building site in order to design the foundation. The plaintiffs hired Louisiana Testing and Inspection, Inc. (LTI) to perform the geotechnical investigation and prepare a report for Coast.

Dale Phillips, a civil engineer working for Coast, testified that the LTI report was used to understand the nature of the soil on the building site. He explained that the presence of expansive soil under a foundation causes differential movement, or swelling, which can result in cracks in the walls and flooring of a home. Mr. Phillips' testimony further related that when designing a foundation, knowing the nature of the soil underneath allows the engineer to "design something in the foundation to make it stiff enough to try to resist any of the differential movement."

According to the American Society for Testing and Materials (ASTM) Book of Standards submitted into evidence by the plaintiffs, the primary method of identifying soil's swell potential is to perform testing to determine the soil's "Atterberg Limits[1] (AL)" and "Plasticity Index[2] (PI)." ASTM's manual provides two

---

[1] "Atterberg limits" is defined in the 2000 Annual Book of ASTM Standards as follows:

Originally, six "limits of consistency" of fine-grained soils were defined by Albert Atterberg: the upper limit of viscous flow, the liquid limit, the sticky limit, the

procedures which can be used to prepare soil specimens for testing: the "dry prep" procedure (where the soil specimen is dried in an oven before undergoing testing) and the "wet prep" procedure (where the soil specimen is not dried in an oven before testing).

Here, LTI used the "dry prep" procedure to prepare the Campbells' soil specimens for testing. LTI then prepared a report containing the results, which was submitted to Mr. Philips. Mr. Phillips testified that, according to his reading of LTI's report, he understood the soil on the Campbells' property to be non-expansive and designed a foundation accordingly.

After construction was complete, the plaintiffs began noticing cracks in various areas of their home. Following consultation with various structural and geotechnical engineers, the plaintiffs filed suit against LTI, alleging that its failure to discover and report the presence of expansive soils to the foundation design engineer caused the foundation failure.[3] Specifically, the plaintiffs alleged that LTI's use of the "dry prep" method resulted in underreporting of the AL and PI values of the soil, and LTI knew or should have known that the "dry prep" method uniformly produces lower AL and PI values. They further argued that LTI's use of the "dry prep" method violated ASTM standards.

---

cohesion limit, the plastic limit, and the shrinkage limit. In current engineering usage, the term usually refers only to the liquid limit, plastic limit, and in some references, the shrinkage limit.

[2] "Plasticity index" is defined in the 2000 Annual Book of ASTM Standards as "the range of water over which a soil behaves plastically. Numerically, it is the difference between the liquid limit and the plastic limit."

[3] Originally, Coast was included in the plaintiffs' petition but was subsequently dismissed on a motion for summary judgment.

LTI asserts various other causes for the plaintiffs' damages. It contends that the plaintiffs' property had significant drainage problems, that they ignored instructions provided in the report for the protection and maintenance of the foundation, and that they practiced poor construction in the building of the home, ultimately resulting in the failure of the home's foundation.

Following trial, the trial court issued a judgment in favor of LTI, finding that the plaintiffs failed to carry their burden of proving that LTI's soil testing was improperly performed or the results improperly reported. The plaintiffs appeal, asserting that the trial court erred in: (1) applying an incorrect burden of proof on the parties; (2) finding that LTI owed no duty to use the "wet prep" procedure in its testing; (3) finding that no soil tests performed on the plaintiffs' home showed the potential for foundation swelling; (4) finding that they failed to prove an alternative design would have prevented the damage; and (5) finding that LTI did not breach any contractual or tortious duty owed to the plaintiffs.

**Discussion**

*Cause-in-Fact*

In the plaintiffs' first two assignments of error, they assert that the trial court erred in finding that they did not prove that LTI's underreporting of the soil's swell potential was the cause of their damages. In brief, the plaintiffs contend that the trial court erred because "it placed on the Campbells the burden to disprove all 'possible' causes, which the law does not require; and ignored LTI's burden of proving its affirmative defense of alternate causes by a preponderance." Also, in brief, the plaintiffs assign error to three of the trial court's specific findings: (1) finding that the critical swell potential of the tested soil was not discovered by LTI "by pure

3

chance"; (2) finding that no soil test showed the potential for the swell conditions present; and (3) finding that the plaintiffs failed to prove another foundation design would have been used and/or the damage would not have occurred anyway. Because these findings were relied upon by the trial court in determining that the plaintiffs failed to prove that LTI's conduct was the cause-in-fact of their damages, they will be discussed collectively below.

The standard negligence analysis employed to determine whether to impose liability under La.Civ.Code art. 2315 is the duty/risk analysis, which consists of the following four-prong inquiry: (1) Was the conduct in question a cause-in-fact of the harm which occurred? (2) Did the defendant owe a duty to the plaintiff? (3) Was that duty breached? (4) Was the risk, and harm caused, within the scope of protection afforded by the duty breached? *Rando v. Anco Insulations, Inc.*, 08-1163, 08-1169 (La. 5/22/09), 16 So.3d 1065. "Under [this] analysis, all four inquiries must be affirmatively answered for plaintiff to recover." *Id*. at 1086. In *Hanks v. Entergy Corporation*, 06-477, p. 19-20 (La. 12/18/06), 944 So.2d 564, 578, the supreme court stated:

> In an action to recover damages for injuries allegedly caused by another's negligence, the plaintiff has the burden of proving negligence on the part of the defendant by a preponderance of the evidence. *Benjamin ex rel. Benjamin v. Housing Authority of New Orleans*, 04-1058, p. 5 (La.12/1/04), 893 So.2d 1, 4; *Cangelosi v. Our Lady of the Lake Regional Medical Center*, 564 So.2d 654, 664 (La.1989). Proof is sufficient to constitute a preponderance when the entirety of the evidence, both direct and circumstantial, shows the fact sought to be proved is more probable than not. *Benjamin*, 04-1058 at p. 5, 893 So.2d at 4-5; *Cangelosi*, 564 So.2d at 664. Thus, the plaintiff in this type of action must produce evidence from which the factfinder can reasonably conclude his injuries, more probably than not, were caused by the negligence of the particular defendant. *Cangelosi*, 564 So.2d at 664. The plaintiff, however, does not have to conclusively exclude all other possible explanations for his injuries, because the standard is not proof beyond a reasonable doubt. *Cangelosi*, 564 So.2d at 664; *Boudreaux v.*

4

*American Insurance Co.*, 262 La. 721, 736-38, 264 So.2d 621, 626-27 (1972). Placing the burden of proof on the plaintiff requires him ultimately to persuade the factfinder concerning the defendant's negligence, and if the factfinder is undecided after all the evidence has been presented, the plaintiff loses because of the failure of his evidence. *Cangelosi*, 564 So.2d at 664; *Boudreaux*, 262 La. at 736-38, 264 So.2d at 626-27.

In its reasons for judgment, the trial court stated, as follows:

> The issue is whether the use of the dry method is causally connected to the failure of the foundation and resulting damages, and whether using the dry prep method was below the standard of care for soil testing.
>
> . . . .
>
> As all are aware, the plaintiff must carry the burden that the LTI's soil testing was either improperly performed or the result improperly reported and this resulted in a designed foundation failure.
>
> The alternate borings taken later do not provide a great deal of help to the Court, other than to show there are some variances throughout this lot. Mr. Gorsha, an engineer who conducted soil tests, confirmed that the swell conditions present were not discovered "by pure chance". His testimony was clear that nothing in any soil test show the potential for swell conditions present at this residence. He explained further that a tree may have been removed from that area and heavy clay placed at the removal site as potential cause of the uplifting at the one specific location. I note this area was heavily wooded prior to development of the subdivision, and in particular on the subject lot. I accept this testimony as true.
>
> When analyzing the testing methods (wet v dry), I note both are in regular use and accepted in the residential construction field. More importantly, even critical, is the fact that the engineer Mr. Dale Phillips did not know, ask, and apparently did not care which method was used when designing the post tension slab. It is difficult under these circumstances to find the "dry prep" test to be substandard.
>
> Even if I were to find the dry [sic] prep test was marginally better, I find the plaintiff's [sic] have failed to prove that another design would have been utilized and/or the uplifting apparently occurring would not have occurred anyway.
>
> It is clear other factors and conditions may have caused or contributed significantly to the problem, i.e. building site preparations, the construction of grade beams below grade, the backfilling of

5

excavated areas and the most unusual occurrence of water saturating the subsoil. The latter condition was discovered when additional soil studies were performed after construction.

Whether LTI's alleged negligence was the cause-in-fact of the plaintiffs' damages is a factual determination left to the trial court. *Toston v. Pardon*, 03-1747 (La. 4/23/04), 874 So.2d 791. Further, when the trial court has allowed both parties to present their experts before making its factual determinations, its choice of alternative permissible views cannot be considered to be manifestly erroneous or clearly wrong. *Id.*

Here, the trial court heard expert witness testimony from both the plaintiffs and the defendant. The plaintiffs presented the expert testimony of Billy Prochaska, a civil engineer specializing in geotechnical engineering, whom the plaintiffs hired to conduct forensic testing of the soil. Mr. Prochaska testified that his testing revealed much higher AL limits than initially reported by LTI. He opined that LTI's use of the "dry prep" method caused LTI's underreporting of the soil's swell potential. Mr. Prochaska related that he did not believe the foundation's problems were caused by a drainage problem or tree problem.

The trial court also heard the testimony of Dale Phillips, the civil engineer who designed the Campbell's foundation for Coast. He testified that he typically did not inquire into whether a geotechnical report included the use of the "wet prep" or the "dry prep" method, and in designing the Campbell's foundation, he could not recall whether the report indicated LTI used the "dry prep" or "wet prep" method. When Mr. Phillips was asked whether he would have designed the foundation differently if he had Mr. Prochaska's "wet prep" results, as opposed to LTI's initial results, he answered, "I think I would have." He explained that if given the higher PI numbers

6

Mr. Prochaska reported, he "would have inferred that the soil had some expansive nature to it, and I would have done a more expansive calculation and analysis and design."

Another expert, Newton J. Gorsha, Jr., testified for the defendant. Mr. Gorsha testified that he was a registered professional civil engineer specializing in geotechnical engineering. He explained that he tested soil specimens for the Campbells' property using both the "wet prep" and "dry prep" method for comparison. He related that he compared his test results to LTI's initial results and found that "[t]here was virtually no difference." Mr. Gorsha testified that he did not discover the same conditions in the soil that Mr. Prochaska reported. However, he explained that he ran an analysis to estimate the swell using Mr. Prochaska's reported numbers and determined that even "if I would have been writing a report based on any of these [LTI's and Mr. Prochaska's soil testing results], I would not have detected the kind of swell that occurred at this house." He stated further, as follows:

> [I]t's an anomalous condition. Whenever we go out and perform a geotechnical investigation, we're looking for the site conditions to design for, but we're also looking for an anomaly. Anomaly is what we consider a weak condition or a potentially, you know, explosive swell condition that would affect our analysis.
>
> Since the anomalous conditions really didn't show up, any Geotechnical Engineer writing the report would have made the same mistake. And I don't really consider it a mistake; it's just we didn't get enough to hit that spot.

When asked what he believed caused the swell, Mr. Gorsha answered:

> I can only theorize. There are two theories that I have. We had a lot of trees out there on the site. And with their removal, surface material was put in. I'm fairly certain that happened. This area, because of the shape, the circular shape of the swelling, and it is very, very uniform going through the living or sitting area. It appears to me, and I have seen this dozens and dozens of other forensic investigations that I've performed. Any time we have tree stump, its going to swell up in

7

a circular pattern. That's what we have here. So that leads me to theorize that there was a large tree or several trees that were clustered together that got pulled out and we have a very, very, dry clay that was put in there with high clay content.

The trial court's reasons for judgment reveal that, after evaluating the expert testimony, it found that the plaintiffs failed to prove that LTI's conduct was the cause-in-fact of the plaintiffs' damages. As explained above, the trial court's choice of alternative expert views cannot be considered to be manifestly erroneous or clearly wrong. *Id.* However, where documents or objective evidence so contradict a witness's testimony, or the testimony itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witnesses's testimony, a reviewing court may find manifest error even in a finding purportedly based on a credibility determination. *Id.* Our review of the record supports the trial court's determination that the plaintiffs failed to prove LTI's conduct was the cause-in-fact of the plaintiffs' damages. Further, we also find that the trial court's findings that LTI did not discover the swell potential of the soil "by pure chance" and that no soil tests showed the potential for the swell condition, supported by the record. Mr. Gorsha opined that because neither his soil testings, Mr. Prochaska's testing, or LTI's testing detected the kind of swelling the plaintiffs were experiencing, it could not be said that LTI's results were improperly reported. Further, Mr. Gorsha testified that he used both the "wet prep" method and the "dry prep" method and found "virtually no difference." Further, our review of the record does not reveal evidence so contradictory to Mr. Gorsha's testimony to conclude that a reasonable factfinder could not credit his testimony. While Mr. Prochaska provided contrary testimony concerning the "wet prep" and "dry prep" method, when asked whether he believed that Mr. Gorsha "had a good report, good data, good engineering," he replied, "Yes."

8

*Duty*

In their third assignment of error, the plaintiffs assert that the trial court erred in finding that LTI did not owe a duty to them to use the "wet prep" procedure. They refer to the ASTM standards book which specifies that the "wet prep" method should be used unless the "requesting authority" specifies the "dry prep" method. They assert that the plaintiffs did not request a method, and, thus, the "wet prep" method was required.

The above discussion concluded that the record supported the trial court's conclusion that LTI's conduct was not proven to be the cause-in-fact of the plaintiffs' damages. Under the duty-risk analysis, all four inquiries must be affirmatively answered for a plaintiff to recover. *Rando*, 16 So.3d 1085. Thus, even if we were to assume that LTI owed a duty to the plaintiffs to use the "wet prep" procedure, the plaintiffs would nonetheless fail to recover. The trial court noted this in its reasons for judgment, stating: "Even if I were to find that the dry prep [sic] was marginally better, I find that the plaintiff's [sic] have failed to prove that another design would have been utilized and/or the uplifting apparently occurring would not have occurred anyway."

**DECREE**

For the forgoing reasons, we affirm the trial court's judgment. All costs of this proceeding are assessed against the plaintiffs-appellants, Kevin and Kim Campbell.

**AFFIRMED.**